EVERSHEDS SUTHERLAND (US) LLP
Ian S. Shelton (Bar No. 264863)
(ianshelton@eversheds-sutherland.com)
500 Capitol Mall, Suite 2350
Sacramento, California 95814
Telephone:      (916) 844-2965
Facsimile:      (916) 241-0501

EVERSHEDS SUTHERLAND (US) LLP
David A. Baay (*Pro Hac Vice* Forthcoming)
(davidbaay@eversheds-sutherland.com)
1001 Fannin, Suite 3700
Houston, Texas 77002
Telephone:      (713) 470-6100
Facsimile:      (713) 654-1301

Attorneys for Plaintiff Crystal McKellar

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CRYSTAL SCRIPPS MCKELLAR, | CASE NO. 3:19-cv-07314 |
| Plaintiff, | **COMPLAINT FOR:** |
| vs. | 1. **Dodd-Frank Whistleblower Retaliation (15 U.S.C. § 78u-6)** |
| MITHRIL CAPITAL MANAGEMENT LLC, MITHRIL GP EMPLOYEE FEEDER LLC, and AJAY ROYAN, | 2. **California Whistleblower Retaliation (Labor Code § 1102.5)** |
| Defendants. | 3. **Wrongful Termination in Violation of Public Policy** |
| | 4. **Nonpayment of Wages (Labor Code §§ 201, 202, 218)** |
| | 5. **Breach of Contract** |
| | 6. **Breach of the Implied Covenant of Good Faith and Fair Dealing** |
| | 7. **Breach of LLC Agreement** |
| | 8. **Statutory Unfair Competition (Bus. & Prof. Code § 17200)** |
| | 9. **Declaratory Relief** |
| | 10. **Injunctive Relief** |
| | **DEMAND FOR JURY TRIAL** |

# INTRODUCTION

1.     Mithril Capital Management LLC is a venture capital firm founded in 2012 and managed solely by Ajay Royan.  On January 22, 2019, Crystal McKellar, a Managing Director at Mithril, received a call from Peter Thiel, the largest investor in the two funds managed by Mithril. Thiel told McKellar that he was concerned Royan was either suffering from a "mental episode" or was "engaged in a massive financial fraud."

2.     Thiel told McKellar he had heard Royan had largely eliminated Mithril's investment team, which Thiel said was "crazy."  Mithril had raised a $740 million fund two years prior that now languished largely uninvested, while the tens of millions in management fees paid by the investors to fund an investment team flowed directly into Royan's pocket.  Thiel repeated, "I can't believe this.  I can't believe how greedy Ajay is.  Ajay has broken Mithril."  Thiel said he wanted to be more involved, but that Royan had intentionally kept him out of the loop and always responded to Thiel's queries by assuring Thiel that things were going well at Mithril.

3.     Thiel's concerns resonated with McKellar.  Shortly before and in the weeks following her conversation with Thiel, McKellar discovered that Royan had lied repeatedly about Mithril in investor meetings, in Mithril's financial statements, on Mithril's website, and in published interviews with the press.

4.     Royan's fraud and misrepresentations include:

- falsely claiming he "waived" management fees charged to Mithril's investors in 2017 after they raised concerns about the slow deployment of capital, when in fact Mithril charged full management fees for that year;

- falsely inflating the valuations of impaired portfolio companies in Mithril's reported financials, allowing Royan to pilfer hundreds of thousands of dollars in unearned management fees and millions of dollars in unjustified carried interest from Mithril's investors;

- falsely representing that Mithril had a much larger investment team than it actually had;

- falsely claiming that Mithril's slow deployment of capital was due to investment

"discipline," when in fact Royan had intentionally whittled down the investment team so that he could personally pocket the lion's share of management fees paid by investors;

- falsely claiming to be one of Mithril's largest investors to allay concerns about alignment, when in fact Royan is one of the smallest; and

- falsely claiming that his entire net worth was tied up in Mithril's funds, when in fact Royan personally collects tens of millions more in management fees than his capital commitment to Mithril.

5.      Royan told these lies to deflect investor concerns, instill false confidence that he was incentivized to act in Mithril's investors' best interest, and persuade investors to not vote to dissolve the fund.

6.      Notwithstanding McKellar's discussion with Thiel and subsequent meetings with Thiel and Royan, McKellar was unable to accomplish corrective action from the inside.   To protect Mithril's investors, McKellar disclosed Royan's fraud to the Securities and Exchange Commission ("SEC") and reported this information to Mithril's outside auditor in March 2019. McKellar had in-person meetings with members of the Corporate Fraud Strike Force at the United States Attorney's Office for the Northern District of California ("USAO") and the Federal Bureau of Investigation ("FBI") in May 2019 and again in June 2019.   At the SEC's request, McKellar then had an in-person meeting with the SEC in June 2019, which was also attended by the FBI. McKellar also produced documents to both agencies pursuant to subpoenas from the SEC and USAO.   McKellar is fully cooperating with these investigations, as she believes they are necessary to defend the interests of Mithril's defrauded investors.

7.      All of McKellar's communications with Mithril's investors, which Mithril now claims were in violation of McKellar's "confidentiality" obligations, assisted investigations by the SEC and other regulators into Mithril.   The sole focus of those communications was Royan's ongoing fraud.   None of McKellar's communications with investors were anonymous, as Mithril falsely claims.   They were discussions that were conducted in person, over the phone, over email, and via text message.   McKellar produced her written communications and reported the substance

1    of her verbal communications with Mithril's investors to the SEC, USAO, and the FBI, which

2    provided those regulators with critical evidence in support of their investigations.

3         8.    Prior to July 15, 2019, Mithril learned about McKellar's cooperation with the

4    government when a Mithril investor the FBI had enlisted to assist in the investigation tipped

5    Royan off.  Mithril swiftly retaliated, terminating McKellar's employment and stripping her of her

6    cash compensation, health care coverage, and her carried interest worth in excess of $15 million.

7    Mithril admitted *in writing* that it knew about the government investigations *before* it acted against

8    McKellar and forfeited her employment compensation on pre-textual grounds.

9         9.    But Mithril was not done.  Within a three-week period in October 2019, Mithril

10   sued McKellar in two frivolous lawsuits in two different states where McKellar has never worked:

11   Texas and Delaware.  Mithril's initiation of serial foreign lawsuits against McKellar—a California

12   resident and former employee—is illegal.  To make matters worse, Royan lied again to Mithril's

13   investors in these public pleadings and then swore—under penalty of perjury—that the allegations

14   were true.

15        10.   The false allegations in Mithril's Texas and Delaware lawsuits are pretexts to

16   justify Mithril's retaliation against McKellar.  Those lawsuits violate laws guaranteeing California

17   employees the protection of California laws and courts.  Non-compete, foreign choice-of-law, and

18   foreign choice-of-venue provisions in employment contracts are unenforceable in California, even

19   in the absence of the transparent retaliation that exists here.

20        11.   Even assuming Mithril's employment agreements are enforceable, McKellar did

21   not violate them.  Confidentiality provisions exist to protect trade secrets, not hide fraud.  Non-

22   compete provisions exist to protect legitimate business interests, not bar truthful communications

23   with regulators.   Mithril's own attorneys have acknowledged in writing that "McKellar's

24   agreements with Mithril do not limit her ability to cooperate with government investigators."  Yet

25   Mithril has retaliated against McKellar for cooperating with the SEC and other regulators, and for

26   assisting in those government investigations.  Mithril's use of its employment contracts to silence

27   and intimidate whistleblowers only highlights the lengths it will go to in order to hide its fraud.

28        12.   Through this action, McKellar seeks to hold Mithril accountable for its unlawful

retaliation against her.  She is entitled to the employment compensation that Mithril unlawfully stripped from her, in addition to the mandatory double damages provided by Dodd-Frank and the punitive damages provided by California law.  But more importantly, she seeks to protect Mithril's investors from further harm.

## PARTIES

13.    Plaintiff Crystal Scripps McKellar is an individual and citizen of California. McKellar was a senior member of Mithril's investment team, managed investor relationships, served on the boards of certain portfolio companies, and held the title of Managing Director from June 14, 2012 through July 17, 2019.

14.    Defendant Mithril Capital Management LLC is a Delaware limited liability company with its principal place of business in Texas.  On information and belief after a reasonable investigation, no member of Mithril Capital Management LLC is a citizen of California.

15.    Defendant Mithril GP Employee Feeder LLC is a Delaware limited liability company with its principal place of business in Texas.  On information and belief after a reasonable investigation, no member of Mithril GP Employee Feeder LLC is a citizen of California.

16.    Defendant Ajay Royan is an individual and citizen of Texas.  Royan is the Managing General Partner of Mithril Capital Management LLC.

## JURISDICTION AND VENUE

17.    The Court has federal subject matter jurisdiction over the claim for Dodd-Frank whistleblower retaliation in violation of 15 U.S.C. § 78u-6 pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 78u-6(h)(1)(B)(i) because this claim arises under federal law.  The Court has supplemental jurisdiction over the remaining claims pursuant to 28 U.S.C. § 1367.

18.    The Court also has federal subject matter jurisdiction over all claims pursuant to 28 U.S.C. § 1332 because complete diversity of the parties exists and the amount in controversy exceeds $75,000.

19.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial

1 part of the events or omissions giving rise to the claim occurred in the Northern District of
2 California, and because all Defendants are subject to the Court's personal jurisdiction in this
3 district with respect to this action.

**ALLEGATIONS**

**Background**

6    20.    Mithril Capital Management LLC is a venture capital firm with approximately
7 $1.28 billion under management.  It was founded in June 2012.  Mithril advises two venture
8 capital funds:  Mithril LP (Fund I) and Mithril II LP (Fund II).  Mithril raised Fund I in 2012 to
9 invest in private technology companies.  Fund I had $538 million in committed capital, with $100
10 million contributed by Thiel, a widely known and successful venture capitalist.  Although Thiel is
11 the largest investor in both funds and holds special rights, he is not an owner, officer, or employee
12 of Mithril.  Royan is the sole owner of Mithril Capital Management LLC (the management
13 company for both funds), and owns and controls the General Partner of Fund I and Fund II.

14    21.    McKellar joined Mithril in June 2012 and served as a senior member of Mithril's
15 investment team, with the title of Managing Director.  Her primary responsibilities involved
16 sourcing and managing investments, maintaining Mithril's investor relationships, and serving as a
17 board member at Mithril's portfolio companies.  She also served as General Counsel.

18    22.    Mithril's June 25, 2012 offer letter identified McKellar as "an employee of the
19 Company" and provided a salary in addition to other benefits.  It further states that "[i]n addition
20 to your salary, you will also receive 300 basis points of the Available Carried Interest" in Fund I.
21 Royan signed McKellar's offer letter in his capacity as Managing Member of Mithril Capital
22 Management LLC.

23    23.    Royan and McKellar had a pre-existing relationship before McKellar joined
24 Mithril.  McKellar attended Yale for her undergraduate studies and Harvard for law school.
25 McKellar and Royan attended Yale together and knew each other socially.  They both kept in
26 touch after Yale while each pursued their respective careers.

27    24.    Upon joining Mithril in 2012, McKellar trusted Royan, believed he was ethical and
28 intelligent, and viewed him as a skilled investor.  Because she held Royan in high esteem and had

a pre-existing social relationship with him, McKellar gave Royan the benefit of the doubt and on several occasions expressed admiration for him in public and private.

25.     Although McKellar also served as Mithril's General Counsel, McKellar spent the vast majority of her time at Mithril performing non-legal job functions related to Mithril's investment activities and communications with Mithril's investors.  This was particularly true after May 2013, when Royan hired an Associate General Counsel to handle most legal functions at the firm.  In addition, McKellar is an investor in both Mithril funds.

26.     McKellar was an employee of Mithril Capital Management LLC from June 14, 2012 through July 17, 2019, when Mithril terminated her in retaliation for reporting fraud to the SEC and other regulators.

27.     Although Mithril purported to change McKellar's classification from an employee to an independent contractor through a February 11, 2019 consulting agreement, this re-classification was ineffective and unlawful.  McKellar did not serve as Mithril's General Counsel after that date, but she continued to perform many of the same non-legal job functions she performed as an employee before and after the re-classification.  Indeed, her job title of "Managing Director" remained the same, and McKellar retained a Mithril email address.

28.     From February 11, 2019 until July 17, 2019, McKellar was an employee of Mithril because she (1) was not free from the control and direction of Mithril in the performance of her work, (2) did not perform work outside the usual course of Mithril's business, and (3) was not customarily engaged in an independently established occupation or business.

**Mithril Launches Fund I**

29.     When Fund I launched in 2012, it was supported by a large and sophisticated investment team, which was originally comprised of five Managing Directors, three Principals, two Associates, and one Analyst.  In the first nine quarters of the Fund I investment period (June 2012 to September 2014), the team deployed over 50% of the fund's $538 million in committed capital in an array of promising technology companies.

30.     All of Fund I's most promising portfolio companies were sourced during this time period by the original team.  Fund I was a great financial success.  For example, as publicly

reported in the press, Johnson & Johnson recently purchased a Fund I portfolio company—Auris Health—for $3.4 billion and up to $2.35 billion in additional contingent payments, depending on the achievement of select predetermined milestones.  The Auris sale alone resulted in an enormous profit for Fund I.

31.     On March 28, 2014, McKellar signed an admission letter confirming her status as a "Professional Member" of Mithril GP Employee Feeder LLC.  As its name suggests, the feeder agreement was the mechanism for awarding carried interest in Fund I to Mithril's "[e]mployee[s]."

32.     The admission letter confirmed her "initial carried interest percentage is 3.00%" in Fund I.  It further confirmed her "Employment Date" of June 14, 2012.  It described how McKellar's carried interest would vest over time on certain anniversaries of her "Employment Date."  It also cross-referenced the Amended and Restated Limited Liability Company Agreement of Mithril GP Employee Feeder LLC (LLC Agreement) dated March 28, 2014.

33.     Despite the purpose of the LLC Agreement to provide incentive compensation to Mithril's employees, the LLC Agreement is replete with provisions that are illegal under California law and purport to strip Mithril's California employees of the benefits of California laws and courts.  McKellar was not independently represented by legal counsel when she signed the admission letter to the LLC Agreement.

### Royan Alienates his Employees at Mithril

34.     Most of the initial investment team came from Thiel's own network of funds and companies.  Despite Fund I's success and the strength of the initial investment team, Royan's peculiar and dictatorial management style alienated his team.

35.     Royan was resistant to team meetings, disappeared for lengthy periods of time, kept team members in the dark about his plans and priorities, and rarely followed through on promises of increased salary or carried interest.  Royan's leadership qualities had an unsurprising side effect—employee dissatisfaction and, ultimately, significant attrition.  By the first quarter of 2015, *seven* of Mithril's eleven original investment team members had departed the company.  Mithril hired new investment team members in 2014 and 2015 to replace those who had departed.

36.     Rather than replace Mithril's departing Chief Financial Officer with a qualified

individual in San Francisco, Royan formed a wholly-owned, non-U.S. based entity called Mithril360, where he installed his sister and an accounting team that worked exclusively for her. Royan's sister became the exclusive point of contact for Mithril's outside auditor.

37.     By late 2014, Fund I was about 55% invested.  Royan then decided to start laying the groundwork for Fund II.  Royan asked McKellar to spearhead this process.

### The Buildup for Fund II

38.     McKellar dedicated herself to fundraising for Fund II.  From late 2014 to early 2016, in addition to managing Mithril's portfolio companies, she worked with her contacts to develop investor prospects.  The majority of outside capital in Fund II came from these new investor relationships who had not invested in Fund I.

39.     During the fundraising process, McKellar felt confident and believed in Mithril's product.  Fund I was doing extremely well, and McKellar strongly believed that Mithril could replicate that success in Fund II.  Reflecting this belief, McKellar personally committed $300,000 to Fund II.  McKellar had invested $200,000 in Fund I, and was the only Mithril employee to invest in both funds.

40.     Mithril had its first and only investor (LP) meeting in spring 2015.  Thiel, Royan, and several of Mithril's portfolio company CEOs gave compelling presentations, followed by breakout sessions with investors.  There was a substantial amount of justifiable excitement around Fund II, and Mithril had positive momentum behind it when it formally started the Fund II fundraising process in fall 2015.  Royan and McKellar traveled to New York, Boston, Chicago, and Detroit to meet with prospective investors, and investors from each of these cities invested significant sums in Fund II.

41.     Mithril built on the early success of Fund I by raising substantially more capital for Fund II, raising a $740 million fund. Of the $740 million committed to Fund II, $596 million was invested by outside investors who pay management fees to Mithril, with Mithril insiders and Thiel contributing the remainder.

42.     During Fund II's five-year investment period, fee-paying investors were obligated to pay 2% of their committed capital annually in management fees—collectively approximately

$11.9 million per year.  This amount is in addition to the management fees that continued to be collected from Fund I.

43.     Thiel is the largest investor in Fund II by far.  However, Thiel does not participate in the day-to-day management of Fund II nor is he an officer or partner at Mithril.

44.     Thiel's large investment provides him with special rights.  Along with Royan, he is a member of Fund II's "Investment Committee," which gives him veto power over investment decisions.  In addition, Thiel does not pay management fees, and under a "key man clause" in the Fund II LP Agreement, Thiel can effectively end Fund II's investment period.  Thiel can also remove Royan as the General Partner of Mithril for cause according to a separate side letter agreement.  A supermajority of Fund II investors can also vote to dissolve the fund.

45.     During meetings with prospective Fund II investors, Royan would explain that Mithril only invested where it saw a path to a 10x return from the investment.  Royan said that he planned to essentially repeat this same strategy with Fund II as with Fund I.

46.     When investors asked if Fund II was intended to be a follow-on vehicle that would invest in Fund I portfolio companies, Royan would say no because most of Fund I's best portfolio companies had valuations that were too high to provide Fund II a "venture return."

47.     During these fundraising meetings, Royan also repeated the mantra that he did not want to get rich off management fees.  Royan would emphasize that he should only make money (from carried interest) if Mithril's investors made money, and that this was the way it should be.

48.     Mithril's marketing materials, including its investment deck and private placement memorandum, promoted Mithril's investment team as coming from "diverse backgrounds including bioengineering, software, policymaking, finance, and law," and further explained that the investment team was "responsible for identifying, evaluating, analyzing, and managing investments for Mithril."  The investment deck and private placement memorandum disclosed the names and biographies of the eight investment team members.  The investment deck also prominently featured Thiel, and indicated that Thiel, along with Royan, "direct[ed]" Mithril's investment decisions.

**Investors Voice their Concerns about Mithril and Royan**

49.     During the fundraising for Fund II in 2015 and 2016, several potential investors, including a public interest foundation, a public pension plan, and Cambridge Associates, a large advisory firm to prospective Mithril institutional investors, expressed concern about the relatively small size of Mithril's investment team, and about Mithril's past attrition of investment team members.  This was particularly a concern for investors given the fact that Royan was seeking to raise a larger second fund than the first.

50.     Royan reassured them by promising he would increase the size of his investment team, which at the time numbered just eight members, by 3-4 senior hires after the second fund closed.

51.     Royan reiterated that he did not want to get rich off management fees and that he planned to use the additional management fees from the second fund to pay for his growing investment team.

52.     Royan also told Cambridge and other prospective investors that he had allocated 20-30% of the carried interest from Fund I and Fund II to Mithril's investment team in order to assure team retention.  This was important to investors and their agents, including Cambridge, whose investors subsequently committed approximately $100 million to Fund II based on Royan's representations.  Investors who committed to Fund II also made clear that Thiel's involvement was important to them, and that they had made their investment decisions in part based upon their respect for Thiel and his reputation as an excellent investor.

53.     On April 4, 2016, Mithril had its first close for Fund II with $600 million in committed capital.  Because Fund I still had significant capital to deploy at this time (it had only deployed $370 million of its $538 million fund), Fund II's "Effective Date" was delayed to the final close of January 4, 2017.  Mithril continued to invest Fund I in new investments throughout 2016, which it would not have been permitted to do if Fund II had been declared "Effective" during that time period.

54.     Because Fund II's "Effective Date" was January 4, 2017, this was the first date on which Mithril was legally entitled to collect management fees from Fund II investors.

55.     Despite Royan touting the credentials of Mithril's team to investors, employee attrition continued in 2016 after the first close with the departures of two senior investment team members: a Managing Director and a Principal.  At Thiel's recommendation, Mithril hired an additional Principal in mid-2016, but he departed within a handful of months.  Attrition continued after the final close on January 4, 2017, with the loss of two more investment team members from the already-shrunken team:  an Associate in 2017 and a Managing Director in early 2018.

**Royan Makes False Compensation Promises to his Employees**

56.     The story behind the team departures was similar: each had been promised additional compensation after hitting professional milestones and/or the close of Fund II, and in every case Royan reneged on his promises.

57.     McKellar became aware of Royan's false promises to his team in the summer of 2017, after she asked Royan about his plans to award additional carried interest in Fund I to the investment team members who had created so much value by investing Fund I.  McKellar was aware that only approximately 10% of the carried interest in Fund I had been allocated and that Royan held the remaining 90%.  Given Royan's repeated statements to investors that he had allocated 20-30% of Fund I's carried interest to the investment team in order to ensure employee retention, she anticipated he would be making additional awards to her and others now that Fund I's investment period had ended.

58.     When McKellar raised the topic with Royan, he grew angry and burst out, "NO ONE IS GETTING ANY MORE CARRY IN FUND I."  When McKellar brought up Royan's statement to investors that he would allocate 20-30% of Fund I's carry to his team, he snapped, "You didn't count on that, did you?  It's not like Mithril is an episode of Survivor."

59.     McKellar realized that Royan not only planned to keep 90% of the carried interest in Fund I—a fund whose success was the result of a team effort—but also had lied to Fund II's investors when inducing them to invest.  McKellar believed that Royan's actions would result in exactly the situation that Cambridge and other investors were concerned about:  demotivate Mithril's investment team and cause more turnover.

60.     In mid-July 2017, McKellar met with two other Managing Directors on the

investment team.   They were frustrated because both had been promised significant salary increases after the close of the second fund, and Royan had refused to honor his promises in both cases.   They also explained to McKellar that Mithril's 2014 team exodus had been caused by Royan's false promises to his team regarding compensation.

61.     McKellar and the two other Managing Directors observed that between the two funds, Royan was now collecting approximately $21 million per year in management fees, the majority of which was going directly into his pocket given how small the team had become.   They were perplexed as to why Royan would not just allocate a small portion of the huge fee stream to building a world-class investment team and motivating the employees he already had.   In September 2017, Mithril lost another talented investment team member.

**The Problems with Fund II**

62.     Between October 2017 and January 2018, McKellar took a modified maternity leave.   During her maternity leave, McKellar continued supporting her portfolio companies and performing diligence on prospective investments.   She worked during her maternity leave because she was concerned about the slow pace of deployment of the fund and the under-resourced investment team.   By the end of 2017, only $7.7 million of Fund II had been invested, and almost $12 million in management fees had been collected from Fund II investors.

63.     When she returned to the office full-time in February 2018, McKellar heard rumors that Royan planned to move the firm to Texas.   Throughout the years, Royan had periodically discussed his desire to move to a tax-free state or U.S. territory, and the prior year Royan had floated the idea of moving Mithril to Seattle in order to avoid California state income tax, but then dropped the idea.   McKellar initially discounted the Texas rumors as equally insubstantial.

64.     In spring 2018, Royan was frequently absent from the office and made himself unavailable to evaluate potential investments when team members identified interesting technology companies.   Around this time, Royan hired a new Chief of Staff named John Kingsbury, whose job was to help manage Royan's schedule and perform other administrative tasks on behalf of Royan and his sister.

65.     In May 2018, another Managing Director gave notice that he was departing the

firm.  The same day, Royan took McKellar to lunch, told her about his plan to move the office to Texas, and tried to convince her to move.  Royan talked extensively about the high taxes in California and the high cost of living in San Francisco, and tried to tempt her to move by stating that Texas did not have a state income tax.

66.     McKellar responded that she planned to continue to live in California and that Mithril's investors had selected a Silicon Valley-based fund for a reason.  McKellar urged Royan to keep at least a handful of team members in San Francisco to maintain the network and opportunities Mithril promoted itself as having.

67.     McKellar also raised her concerns about Mithril's slow deployment of capital during the lunch with Royan.  He deflected her concerns by claiming the question was not whether there were enough opportunities to invest Fund II, but rather that he was fielding too many great opportunities for the limited amount of capital he had.  Royan claimed to have spent the past several months meeting with sovereign wealth funds around the world seeking to raise a new $5 billion fund.  McKellar found this absurd given Mithril had not yet invested even 3% of Fund II.

68.     During this conversation, Royan praised McKellar's contributions to the fund, her leadership on Mithril's investment team, and her close relationship with Mithril's investors.  Royan reminded McKellar that she was Mithril's highest paid employee, and told her he was giving her a significant salary increase.

69.     Royan also told McKellar that in light of her value, that while he hoped she would reconsider her decision not to move to Texas, she would be the only team member who would be permitted to continue working from California after he moved the firm.  Royan followed through with his promise to increase McKellar's pay.

70.     That summer, one investment team member, Paul Leggett, moved to Texas at Royan's demand.  The four remaining members of the investment team, which now included two recent junior hires, made clear they were not moving.  Leggett, at Royan's direction, told the remaining members that they would not be permitted to stay at Mithril if they did not move to Texas, and that they should be making plans to transition out.

71.     Leggett also confided to McKellar his concern that Royan was not doing enough to

financially motivate the remaining investment team members to move to Texas, and expressed his disbelief that Royan would not allocate just a small portion of the $21 million in annual management fees to their intended purpose of funding a full-size investment team.  Instead, that money was just flowing into Royan's pocket.

72.     Both Leggett and McKellar discussed their concern regarding Mithril's anemic deal flow, which they identified as a direct result of the investment team's small size and understandable distraction looking for new jobs.  Leggett said he could not figure out what Royan was "solving for" and McKellar and Leggett agreed that Mithril's investors were being harmed by Royan's failure to maintain an appropriately sized investment team in order to keep the lion's share of management fees to himself.

**Investors Start Asking Questions about Fund II**

73.     Given the unusually slow pace of capital deployment, investors started asking questions.  McKellar attended at least five meetings with major Fund II investors with Royan between July and November 2018.  They all asked about the slow pace of investment, and Royan would provide excuses: he would state that Mithril was looking at a lot of deals but valuations were inflated, and that the most important thing was to stay disciplined.

74.     Royan told investors the move to Texas would help Mithril be successful because people saw the world differently outside of California.  He said he had not decided to what extent Mithril would keep a presence in San Francisco, but that McKellar would be staying in San Francisco for the foreseeable future, and that there would be a transition period for other team members after the move.

75.     During these investor meetings, Royan would also repeat an outlandish claim that two CEOs from Fund I's most successful portfolio companies planned to contribute all of their equity in their companies to a permanent capital vehicle that Royan would manage and that Fund II investors would have the opportunity to participate in.  Royan would name the CEOs by name in these investor meetings.

76.     McKellar could not imagine that either founder would be willing to give up their stakes in their own companies and effectively place more value in Royan's investment decisions

than in their ability to grow their own companies.  McKellar believed there was no way this claim was true, and that it had the potential to damage the reputations of the CEOs at issue.

77.     During the second half of 2018, Royan was increasingly detached from the team. He rarely came to the office, and no one—including his Chief of Staff whose job it was to manage Royan's calendar—seemed to know where he was.

78.     In one instance, Royan showed up embarrassingly late for a meeting with the CEO of a highly sought-after technology company that McKellar had brought in.  Not surprisingly, the meeting did not go well, and Royan told McKellar later that evening that he did not like the way he was treated during the meeting.  He then texted McKellar that they should "hard pass" the company.  Whatever the economics of that lost opportunity, Royan's failure to show up on time ensured that Mithril did not have the chance to compete.

79.     During the late fall of 2018, multiple investment team members sought out McKellar and expressed their view that Royan was behaving unethically.  Team members told McKellar that they believed Royan had no intention of actually investing the second fund from which he was being paid such rich fees.  They felt the existing investment team was just "window dressing," and that Royan was just "siphoning management fees" from Fund II investors as long as possible while he waited for his carried interest in Fund I to be distributed, and sought to shield this income from California taxes by his move to Texas.  All the while, Royan whittled down the investment team as part of his plan to keep even more management fees for himself.

**Royan Starts Lying to Investors**

80.     On December 11, 2018, Royan and McKellar met with a sophisticated Fund II investor.  Two representatives from the investor pressed Royan on the slow pace of capital deployment and appeared unsatisfied with Royan's default answer that Mithril was not investing due to Royan's admirable "discipline."

81.     The investor reminded Royan that they were invested in other funds and also did direct investing, and so they were not impressed by Royan's theatrical drawing of a "two by two" of intrinsic versus productive value to explain his lack of investing activity.  Finally, Royan claimed Mithril had looked at 1,000 deals in the prior 12 months but that the companies did not

1    meet his high standards or were overvalued.

2         82.    McKellar was surprised to hear that Mithril had looked at so many companies in

3    the prior year; it seemed unlikely given how small the team had become.  A few weeks later, in

4    January 2019, McKellar asked an associate to run a report on Mithril's Salesforce database to see

5    how many companies Mithril had actually looked at in 2018.  It turned out to be a small fraction

6    of the number that Royan had told the Fund II investor.  Royan had affirmatively lied to a large

7    investor to hide the real reason behind Mithril's anemic investment activity.

8         83.    On January 16, 2019, Royan called McKellar and told her that he had decided to

9    fire the remaining four investment team members who were based in San Francisco.  Around the

10   same time, Royan told McKellar that a successful Fund I investment, Auris, had received an offer

11   to be purchased for $3.4 billion, representing a very large exit for Fund I and tens of millions in

12   carried interest for Royan.

13        84.    McKellar believed the two matters were connected—that Royan wanted to break

14   ties with California before he earned the Auris carried interest and therefore had to pay tax on the

15   income to California.

16        85.    McKellar also knew that Royan's self-interested action in firing Mithril's four

17   investment team members would be a disaster for Mithril's investors because Royan had only

18   hired one junior investment team member in Texas.  If this remained the *status quo*, Mithril's

19   entire investment team would have been reduced to three members:  McKellar, Leggett, and the

20   new Texas hire.

21        86.    The new Texas-based investment team member, while smart and skilled at analysis,

22   lacked the experience and network to bring in the deal flow Mithril needed, and had only sourced

23   three investment opportunities in the six months since he had been hired.  A junior to mid-level

24   venture capital investment team member would typically source 50-60 new investment

25   opportunities in a six-month period.

26        87.    At this point, Fund II was over two years into its five-year investment period, and it

27   had only invested $87 million of its $740 million fund.  For this, Fund II investors had paid Royan

28   $27 million in management fees ($3 million per quarter for 9 quarters).

88.     During that same week in mid-January 2019, a large Fund II investor reached out to McKellar after multiple unsuccessful attempts to schedule an update meeting with Royan in Texas, where the investor believed Royan now lived.  Royan's Chief of Staff, John Kingsbury, was in the San Francisco office that week inventorying the office furniture, and McKellar asked him if he could help pin Royan down.

89.     Kingsbury stated he could not schedule any meetings in the new Texas office because the contractor who was handling the office's refurbishment had quit after Royan's sister refused to pay his invoices.  As a result, the office was not yet habitable and Kingsbury was having to spend the majority of his time on the office refurbishment.

90.     Kingsbury also stated that he could not get Royan to commit to *any* meetings and told McKellar his belief that "Ajay has lost interest in running the fund."  McKellar replied to Kingsbury that Royan did not get to lose interest in running the fund because he was being paid a huge sum of money by Mithril's investors to invest and manage the fund.  Another team member was present for this exchange and later expressed his surprise at Kingsbury's frank criticism of Royan.

91.     Around this same time, two large Mithril investors reached out to McKellar over email seeking answers about what was going on at the firm.  The first, a large Midwestern foundation, emailed McKellar with the subject line, "Could you please give me a call?"  The second, a U.S. public pension fund, emailed McKellar with the question, "Anything I need to know?"  At Royan's direction, McKellar did not call either investor and instead told them that Royan would be reaching out to them directly.  McKellar did not participate in those calls.

## Thiel Reaches Out to McKellar about the Problems at Mithril

92.     On January 22, 2019, McKellar received a text from Thiel asking if he could call her later that evening.  Thiel called McKellar at 10:30 p.m. that evening, and they spoke for over an hour.

93.     Thiel told McKellar he had heard Royan had largely eliminated Mithril's investment team, which Thiel said was "crazy."  Thiel said he had told Royan not to fire anyone else.

94.     Thiel said he felt badly and "remiss" that he has been so "disconnected" that things had "spiraled so out of control." He said he wanted to be more involved, but that Royan had kept him out of the loop and always told him things were going well. This statement was surprising, as Royan had represented to McKellar and to Mithril's investors that Thiel was closely involved and that the decisions announced by Royan were joint decisions by him and Thiel.

95.     Thiel told McKellar he was hearing really disturbing things about Royan that made him think Royan was either suffering a "mental episode" or was "engaged in a massive financial fraud," and that he was considering exercising his key man clause and shutting down the fund. He asked for McKellar's opinion.

96.     McKellar told Thiel that she did not have reason to believe either of those two scenarios, but she did believe Royan was grossly mismanaging the team. She explained the situation at Mithril to Thiel: (1) a demoralized, skeleton crew of an investment team that was spending much of its time and energy looking for job opportunities outside Mithril rather than investments; (2) Royan disconnected and prioritizing his own personal tax bill above his obligations to investors; (3) deal flow that was a trickle while huge management fees were flowing in from investors; (4) Royan putting the vast majority of the management fees into his pocket; and (5) the lack of a plan for getting out of this mess, particularly since Royan had not hired a "replacement" investment team in Texas, although he had had a year in which to do so.

97.     Thiel was shocked and furious. He kept saying, "I can't believe this. I can't believe how greedy Ajay is. He has broken Mithril." McKellar mentioned that while Fund II investors were still being polite, it was just a matter of time before they became justifiably incensed that their management fees were not funding an investment team to invest the fund and were instead going straight into Royan's pocket.

98.     Thiel was angry, and said that Royan was going to have to pay the management fees back to investors. McKellar mentioned that much of the investment team that Royan had paraded in front of prospective Fund II investors had departed the firm. She also relayed that Royan had misled prospective investors during fundraising by saying he was going to retain his team by awarding them 20-30% of Fund I's carried interest, but then reneged on this obligation so

1  that he could keep 90% of the Fund I carry for himself, leading to more team departures.

2      99.    Thiel appeared worried about the bait and switch to investors.  Thiel asked

3  McKellar if she would be willing to fly to Los Angeles to meet with him and his team in his home.

4  McKellar said she would and they agreed to meet on January 25, 2019 at Thiel's home.

5      100.   On January 23, 2019, McKellar had dinner with two investment team members in

6  San Francisco, and told them she was meeting with Thiel and hoped to put forward a plan for

7  fixing what was going wrong at Mithril.  She asked the team members what they felt were the

8  major impediments that prevented them from being effective, and what they suggested as

9  remedies.

10     101.   These Mithril employees said they were forced to spend business hours doing

11 personal side projects for Royan and his sister, and that Royan was disengaged and failed to show

12 up for scheduled meetings with CEOs when the team did bring in investment opportunities.  They

13 also repeated their view that Royan never had any intention of investing Fund II, and that he was

14 "siphoning management fees" and Fund I carried interest as long as he could get away with it,

15 with the investment team as window dressing to deflect investor scrutiny.  McKellar said she

16 would work with Thiel to try to get Mithril back on track.

17                    **The January 25, 2019 Meeting at Thiel's House**

18     102.   On January 25, 2019, McKellar arrived at Thiel's house for a meeting with Thiel,

19 Thiel's in-house counsel, and two others.  McKellar and Thiel discussed many of the same issues

20 that they had discussed on the phone.

21     103.   In addition to these concerns, Thiel was also concerned about the valuations Mithril

22 was using for the Fund I portfolio.  He asked McKellar about the valuation process, and she told

23 him that while investment team members were occasionally asked to provide updates on portfolio

24 companies to Royan's sister, that only Royan and his sister had visibility into the valuation and

25 audit process with Mithril's auditors.

26     104.   Thiel said he was uncomfortable about Royan hiring his sister as CFO, whom he

27 viewed as unqualified and conflicted.  Thiel then identified a specific company that Mithril had

28 not marked down after that company adjusted its valuation downward in a recent quarter.  This led

Thiel to believe Royan's sister was distributing false and misleading financials to Mithril's investors.

105.   McKellar agreed that this was problematic and that Mithril needed to have an independent and qualified CFO.  McKellar suggested they should significantly increase the size of Mithril's investment team and motivate the team through appropriate compensation.  She recommended that Thiel should have more interaction with the investment team, and that Mithril should refund at least half of the management fees that had been paid by Fund II's investors. Thiel said he was going to call Royan to come to his house the next day and asked that McKellar join.

106.   Shortly after McKellar left Thiel's house, she received a call from Royan, who said that the Auris deal was confirmed and that he had directed Paul Leggett to fire the entire San Francisco team that day.  Leggett had told the team members they could use "promoted titles" on LinkedIn for six months during their severance period, but that their termination dates were immediate.  McKellar called the team, and three of them confirmed on the phone that they had been fired earlier that day.

107.   An hour later Royan called McKellar back and told her about the meeting at Thiel's house the next day, mentioning he had asked Leggett to join.

108.   Royan told McKellar the meeting at Thiel's house was Royan's idea, and that Royan had called the meeting to discuss recent outreach by a Recode reporter whom Royan said was solely motivated by a reporter's alleged dislike for Thiel.  McKellar did not reveal that she was aware Royan was lying to her.

**The January 26, 2019 Meeting at Thiel's House**

109.   On Saturday, January 26, 2019, a few hours before the meeting at Thiel's house was scheduled to begin, Royan texted McKellar and Leggett asking to meet at a nearby hotel, the Jeremy, to prepare for the meeting together.  McKellar indicated she was not available to meet prior to the meeting.

110.   Shortly before McKellar arrived at Thiel's house, Royan called her.  He talked about the "shakedown" he anticipated at Thiel's house and also told her to expect a "deposition"

1 from Thiel.  Royan said Thiel was going to try to "steal" Royan's carry from the Auris deal,

2 because "other people" were trying to take credit for Auris and "steal" Royan's money.

3       111.    McKellar tried to steer Royan away from his paranoia, and suggested to Royan that

4 perhaps the reason Thiel wanted to meet was because Thiel was concerned about Mithril's slow

5 pace of investment and the fact that Mithril's investment team was so small while the management

6 fees were so large.

7       112.    Royan paused a moment, and then said he needed to "remind" McKellar that

8 Mithril did not charge management fees to Fund II investors in 2017, the first year Fund II was in

9 operation.

10       113.    McKellar was confused by Royan's false statement, and responded that he was

11 mistaken and that Mithril did charge management fees for Fund II in 2017.  Royan responded

12 forcefully that he wanted to "remind" McKellar that he did not charge fees in 2017 for Fund II.

13 Finally, McKellar said she was pulling over to the side of the road so that she could pull up the

14 2017 financials on her phone.  She did so, and told Royan that she was looking at the 2017 Fund II

15 financials.  She confirmed to Royan that they did, in fact, charge the full $11.8 million in

16 management fees for the year 2017 to Fund II investors.

17       114.    Royan seemed annoyed and quietly told her that he must have been mistaken.

18 McKellar told him she was 100% sure that Fund II charged management fees in 2017.  When she

19 arrived at Thiel's house a few minutes later, she mentioned the odd discussion to Thiel's in-house

20 counsel, and they checked the 2017 financials together while McKellar remarked how odd an error

21 it had been for Royan to make over the phone.

22       115.    The meeting at Thiel's house was attended by McKellar, Thiel, Thiel's in-house

23 counsel, Royan, and Leggett.  Royan and Leggett arrived together.  Royan's sister attended a

24 portion of the meeting on the phone.  Rather than own up to his misconduct, Royan repeatedly lied

25 to Thiel to deflect his concerns.

26       116.    Royan lied to Thiel about the identity of Mithril's investors, Mithril's pace of

27 investment, and the amount of Fund II contributed by new investors.

28       117.    Royan's sister lied to Thiel about the management company's cashflows.

118.   Royan, along with his sister, falsely claimed to have waived management fees on Mithril's second fund for the entirety of 2017—a year in which Fund II invested just $7.7 million but charged its investors $11.8 million in management fees.

119.   Royan, along with Leggett, falsely claimed four investment team members whom Leggett had fired *the day before* were still active employees engaged in investing Mithril's second fund.

120.   Royan, along with his sister, admitted that Mithril's financials included falsely inflated valuations.  Thiel asked Royan's sister why she had not written the value of a certain portfolio company down even though the company itself had written down its own valuation in the prior year.  Thiel said that her failure to change the valuation at all indicated to him that there was a problem in Mithril's process and this could be happening with other companies in Mithril's portfolio.  Royan's sister blamed Mithril's outside auditor for artificially inflating valuations in Mithril's financials by refusing to let her mark down investments when she told them of the need to do so.  Royan stated he agreed with his sister's false claim.

121.   Thiel asserted that one particular portfolio company in Fund I, on whose board of directors Leggett currently served, was "going to zero."  Royan and Leggett conceded that this was true.  While they pushed back on Thiel's suggestion that two other companies Leggett and Royan were responsible for were also going to zero, Royan and Leggett did not dispute and affirmatively agreed that this one particular portfolio company was going to zero.

122.   Despite this acknowledgment, in the 2018 Fund I financials that were issued to investors several weeks later, Royan held this particular company at a $1.3 million profit over and above Fund I's cost basis.  By falsely inflating this company's valuation and not writing its value down to zero, as he privately acknowledged should have been done, Royan was able to pilfer almost $500,000 in fraudulent management fees from Fund I investors that they never should have been charged.  In addition, by not writing down the company's valuation to zero, Royan fraudulently collected millions more in carried interest from the Auris exit than he was legally entitled to.

123.   McKellar did not lie at the meeting or allow Royan's lies to Thiel to go

uncorrected.  Although Royan repeatedly glared at McKellar during the meeting in a vain attempt to intimidate her into silence, McKellar repeatedly interjected with the truth, causing Thiel to erupt in anger at Royan on multiple occasions.

124.    Thiel threatened to shut down Mithril due to Royan's greed and mismanagement, again stating that Royan had "broken Mithril."   Royan pretended to be chastened by Thiel's rebukes, and promised to implement the "fixes" McKellar had suggested, as well as replace his sister with an independent CFO, if Thiel would permit the fund to continue.  Thiel agreed and asked McKellar to ensure Royan implemented the fixes they had outlined.

**McKellar Attempts to Implement the Fixes Approved by Thiel and Royan**

125.    On January 28, 2019, McKellar spoke with the San Francisco-based investment team.  They had had conversations with Royan that morning in which he recanted Leggett's firing.

126.    On January 30-31, 2019, McKellar attended a venture capital industry event in Los Angeles.  Several of Fund II's investors were there.  Four of them sought out McKellar, indicated they had spoken to Royan in the past few days and that Royan had told them that things were going very well at the fund.  Given the fixes they were putting into place, McKellar did not dispute this.  During this time, McKellar put together the documentation that was required to implement the new compensation structure, and sent Royan daily progress updates.   Royan initially was responsive to McKellar, but then went dark on February 1.

127.    On February 4, 2019, Kingsbury called McKellar and told her that Royan would not be coming into the office and that Royan had further decided he was not going to be taking any calls or meetings for the foreseeable future, and that McKellar should not try to reach him. Later that morning, Kingsbury reached out to a large Fund II investor to cancel a meeting that was scheduled to occur between the investor, Royan, and McKellar that upcoming Friday.

128.    Kingsbury lied about the reason for the cancellation, claiming in his email that "final stages of moving + usual portfolio business" prevented the Fund II investor meeting from moving forward.

129.    This was not true.  In reality, the meeting was cancelled because, as Kingsbury had told McKellar that morning, Royan had bizarrely decided he was not taking any calls or meetings

for the foreseeable future.  Had Kingsbury provided the real reason for the cancellation, this would have set off red flags for the investor, and so he lied to deflect investor concerns.

130.    Royan continued his silence and did not come in the office or respond to McKellar's emails for the rest of the week.  On Friday, February 8, McKellar was contacted by two of the San Francisco team members who told her they had been summoned to a law office in downtown San Francisco, where they were met by Royan and Leggett and told to sign new offer letters and confidentiality agreements that were subject to Texas rather than California law.

131.    The employees were uncomfortable with Royan's hostile tone during the meeting, and with Royan's demand that they sign the new employment agreements on the spot, without the opportunity to be independently represented by legal counsel.  McKellar agreed that this was inappropriate, but was heartened at the news that the team was being retained and hoped this meant Royan was finally implementing the fixes he had promised at Thiel's house.

132.    That evening, McKellar sent both Thiel and Royan texts letting them know she was happy to hear that the San Francisco-based investment team had been offered the ability to stay on, and that she continued to believe in Mithril's potential.  McKellar got a thumbs up emoji from Thiel and nothing back from Royan.

133.    McKellar was worried by Royan's continued silence and was concerned that he might be backing down from the promises he had made at Thiel's house on January 26.  McKellar then wrote Royan a text with a screenshot of handwritten notes she had taken prior to an investor meeting in 2012 right after McKellar had joined Mithril that glowed with the trust and respect she had for Royan at that time.  McKellar tried to appeal to Royan's better nature and hoped that she could "bring him back" if he was backsliding.  Royan did not respond.

**Royan Claims that McKellar is Not Loyal because She did Not Lie to Thiel**

134.    On February 11, 2019, Royan summoned McKellar to a downtown San Francisco law office where he and Kingsbury were waiting for her.  Royan told McKellar that she could no longer work with him in her current role because of what McKellar had said during the meeting at Thiel's house.  Royan told McKellar he wanted his senior people to be "loyal" to him and "on his side."  McKellar told Royan he was insane for trying to lie to Thiel, that in addition to being

morally wrong it was also stupid because Thiel likely knew the answer to every question he had asked before he had asked them, and further that lying to investors could never be part of her job description.

135.    McKellar said she was loyal to Mithril and its investors, and reminded Royan that when Thiel accused Royan of having "broken Mithril" and threatened to trigger his key man clause and end the fund, that McKellar was the only person in the room who had argued for saving Mithril by fixing the problems that were preventing the fund from being successful.  McKellar further stated that this turn of events made her sad, because building a great organization at Mithril had meant so much to her, and she felt a responsibility to Mithril's investors.

136.    Royan then said he hoped McKellar would continue at Mithril in a new role, in which she assisted Mithril's portfolio companies and sourced prospective investments for the fund, but would no longer be Mithril's General Counsel and would have no role in investor communications, which would now be handled exclusively by Royan and Kingsbury.

137.    Royan indicated McKellar would continue using the title of Managing Director, but that she would receive a new email address at Mithril and that in the next week she would be asked to turn in her phone and laptop and would be given a new phone and laptop.  He said these steps were necessary in light of the fact that McKellar would be working from San Francisco rather than from the new headquarters in Texas.

138.    Royan said he would pay McKellar the annual cash compensation of $450,000 that Thiel and Royan had set at Thiel's home, but set McKellar's new carried interest below the number they had agreed upon (4.5% in Fund I and 0.5% in Fund II, vs. 5% in both Funds).

139.    Royan instructed McKellar that outside counsel was preparing the new employment documentation that would memorialize their discussion, and told McKellar that if she wanted to accept the deal, she had to sign the new employment agreements that same day, February 11, 2019.  It was already after 6:00 p.m.

140.    Requiring McKellar to review and sign the new employment agreements on that same evening ensured McKellar could not be independently represented by legal counsel, and that she would have no time or ability to negotiate the terms of the employment agreements if they

differed from their verbal agreement.  Royan told Kingsbury to accompany McKellar back to Mithril's office, which at this point in the evening was otherwise empty, and to physically monitor her and oversee her signing of the new documents.  McKellar sat for hours at her desk that evening under Kingsbury's close watch, waiting for the documents, but Royan did not send them to her until *12:58 a.m.*, an hour into February 12 and past Royan's stated deadline.

141.    Royan continued to insist McKellar sign immediately, and texted McKellar that she still had a chance to sign the voluminous documents in time to make his February 11 deadline, as it was not yet midnight in Hawaii.  Royan texted to McKellar, "We should be good on Hawaii time.  Which is the only time zone that matters.  Or Alaska."

142.    McKellar gave the documents a cursory review, and was surprised to see the agreements contemplated she might seek employment elsewhere while she worked at Mithril, and she was also surprised that the agreements listed her title as "Advisory Managing Director" when she and Royan had agreed she would continue to use the title of Managing Director.

143.    McKellar was surprised to see that she was being required to resign from her portfolio company boards, as Royan had stated that in her ongoing role she would continue to support her portfolio companies.  However, the timing that Royan had orchestrated assured there would be no time to ask about—much less negotiate—these provisions, so she quickly signed and returned the documents to Royan at 1:14 a.m.

144.    Royan provided his countersigned set to her at 1:37 a.m.  McKellar was not represented by legal counsel during the 16 minute period that elapsed between when Royan sent her the employment agreements and she signed them.  Believing her role with Mithril was continuing, McKellar signed off on her 1:14 a.m. email transmitting the signed employment documents with the statement:  "I look forward to our continuing relationship."

145.    The next day, Royan called and told McKellar that he would not be changing her email address and swapping out her Mithril phone and laptop for new ones until February 28, 2019, the last day of the lease for Mithril's San Francisco office.  He also confirmed in writing that she should use the title "Managing Director", notwithstanding the employment agreement's use of the title "Advisory Managing Director," and signed his email "Very best wishes."

146.   McKellar continued going to the office every day for the next two weeks, and sought to motivate the demoralized team and come up with a plan for how to work effectively together once they lost their office space.  Despite everything that had happened, McKellar was still hopeful that she and the rest of the investment team could create value for Mithril's investors by finding and funding great technology companies.

**Royan Does Not Implement the Agreed Fixes at Mithril**

147.   When McKellar arrived in the Mithril office on February 20, 2019, McKellar was told by an IT professional that he was switching out her phone and laptop that day and that she would be provided with a new email address that afternoon, at which time she would lose access to her old emails.

148.   This caught McKellar by surprise as it was eight days earlier than she had been told the switch would occur, but she quickly backed up her personal photos and family text messaging strings and gave the Mithril IT professional her Mithril phone and laptop.  She was handed a used laptop and phone with factory settings that had no Mithril information on them, and only her personal photos and communications were ported over to the new phone and laptop by the Mithril IT professional, all under the watchful eyes of Kingsbury.  McKellar was not provided with any Mithril information or documents after this date, and never again saw or accessed her old Mithril phone or laptop.

149.   On February 26, 2019, Kingsbury was again dispatched to San Francisco to personally—and with respect to one employee, physically and forcefully—confiscate the remaining four investment team members' phones and laptops.  No one had been given prior warning, and two team members told McKellar that their email had been suspended the night before.  Royan was sending a clear message that he did not trust his investment team.  Although Thiel had forced Royan to "rehire" the San Francisco team, he was doing everything he could to distract, demoralize, and drive them away.

150.   One week later, when McKellar called into the weekly investment meeting, Leggett informed McKellar that Mithril would no longer be holding investment team meetings.  At this point in time, Mithril's full-time investment "team" consisted of Leggett and the new Texas hire.

1    The handful of other Mithril employees served administrative and back office functions.

2         151.    But Mithril's investors were kept in the dark.  Mithril's website continued to list the

3    former team members as current members of the investment team.  Royan falsely claimed to a

4    journalist at Recode/Vox and in an interview at Fortune that Mithril's investment team was 17-

5    strong, and he falsely told investors that "pretty much everyone" on Mithril's investment team had

6    moved to Texas, when only one person had moved.  This was not the only lie Royan told

7    investors.

8                      **McKellar Learns the Full Extent of Royan's Fraud**

9         152.    On February 28, 2019, Fortune Magazine published an interview with Royan in

10   which he sought to "clear the air" after negative publicity the week prior and reassure investors

11   that there were no issues with the fund.  In addition to making the false claim that Mithril had a

12   17-person team, Royan also made a number of other false statements.

13        153.    First, Royan repeated the lie he had told at Thiel's house, by falsely claiming to

14   have waived management fees in the past.  In response to the interviewer's question "Have you

15   heard any complaints about your management fees or your rate of deployment?" Royan falsely

16   stated that Mithril's management fees were "calibrated to performance" and falsely asserted that

17   he had "waived fees to our investors when we feel that we're gonna be spending less than we

18   need.  So we've had no issues with LPs."

19        154.    Second, Royan falsely claimed that he and Thiel were Mithril's "single largest

20   investors" and doubled down on this misleading statement by noting "[w]e have that much skin in

21   the game."  In reality, Royan is one of Mithril's smallest investors.  Royan lied to deflect investor

22   concern by creating a false sense of alignment.

23        155.    Third, Royan falsely claimed the pace of investment for Fund I was "exactly the

24   same with the second fund" and further falsely claimed that the pace of Fund II's deployment was

25   set by Mithril's discipline, when in reality the slow pace was caused by Mithril's lack of an

26   investment team.

27        156.    Finally, Royan exaggerated the success of a Fund I company on whose board

28   Royan sits, falsely stating that the company "power[s] over 250 immunotherapy drugs with

1   antibodies and they get a piece of the economics of every drug." In reality, while the portfolio
2   company in question has a promising pipeline, Royan's statement is simply untrue.

**McKellar Reports the Fraud to the SEC and Other Regulators
and Assists in Their Investigations**

5   157.   Concerned about the lies that Royan had publicly told in the Fortune interview, on
6   March 5, 2019, McKellar transmitted an anonymous whistleblower complaint to the SEC. This
7   letter was addressed to the Associate Regional Director for Enforcement at the SEC in San
8   Francisco. Among other things, the letter explained how Royan was committing fraud by making
9   false and misleading statements to investors with regard to (1) management fees; (2) the size of the
10  investment team and how management fees are spent; (3) the size of Royan's capital commitment
11  to the funds; and (4) the reasons behind Mithril's glacial deployment of capital. Although
12  McKellar did not sign the letter, the letter did specifically identify her as an individual with
13  knowledge. The letter also identifies the author as an investor in Mithril. This statement is true.
14  McKellar is an investor in Fund I and Fund II.

15  158.   On March 6, 2019, McKellar also transmitted an anonymous letter to Mithril's
16  outside auditor. This letter focused on Royan's fraudulent public statement that Mithril had
17  waived management fees in the past, and McKellar highlighted some potentially confusing
18  language in Mithril's financial statements that McKellar was concerned Royan was misusing to
19  support his lie.

20  159.   Finally, McKellar sent an anonymous letter to a Fund I portfolio company alerting
21  the company to two facts. First, Royan had lied in the Fortune interview about the company's
22  clinical progress, despite the fact that he sits on the company's board. Second, Royan had made
23  the claim in numerous investor meetings that this company's CEO was planning to contribute all
24  of his shares to a permanent capital vehicle managed by Royan—on the basis that the CEO trusted
25  Royan's investment acumen above the CEO's ability to grow his own company. McKellar was
26  concerned that Royan's false statements could harm the portfolio company and Mithril's investors.

27  160.   Shortly after her SEC submission, McKellar learned from a portfolio company on
28  whose board McKellar had recently served that Kingsbury had called them and told them to take

McKellar off of their investor update list and that they should instead send their updates directly to Royan's sister.  This instruction was at direct odds with Royan's assurance to McKellar that she would continue in her role supporting her portfolio companies.

161.    On March 18, 2019, the CIO of a Fund II investor reached out to McKellar and asked to meet in person when she was in town later that month.  McKellar and the Fund II investor met on March 28, 2019.  The investor indicated she was concerned about what was going on at Mithril, and that she suspected Royan had been dishonest with her.  She told McKellar that Royan had called her approximately two weeks prior, and told her that he wanted to "remind" her that he had waived Fund II's management fees for 2017.  The investor asked McKellar whether this was true, and McKellar said it was not true, and that Fund II's investors had paid the full 2% management fee for 2017 of $11.8 million.

162.    The investor also related that Royan had told her she should not worry about the slow pace of investment, because not only was Royan one of Mithril's largest investors, but he also had his entire net worth invested in Mithril's funds, to such an extent that he could not afford to furnish his Texas apartment and had to buy cheap shirts from Amazon.

163.    The investor asked McKellar her opinion on these statements and McKellar responded that Royan was one of Mithril's smallest investors and that his entire out of pocket commitment to Fund II was a very small fraction of the tens of millions that Royan had personally pocketed from management fees since Fund II's formation.

164.    The investor was concerned at Royan's lies, and indicated she was also concerned because Royan had failed to hold an annual investor meeting since Fund II's formation, despite numerous promises to her that he would.  She said she was also concerned that Mithril's finances were being handled "offshore" by a "family member" of Royan.  She indicated that she was close with the CIO of another Fund II investor, and that he would also likely be incensed when he learned what was going on.

165.    After the meeting, the investor reviewed the 2017 financials with McKellar's assistance, and subsequently emailed McKellar, stating "Thank you for your clear language, the audit language was very confusing and it is very apparent now that none of the 2017 management

fee was waived. . . . It is very concerning that I was told something that is clearly not true by Ajay regarding fees."

166.    In a text exchange of the same day, the investor noted:  "The more I read through the audit the more serious this situation is [as] the fees are more than the entire fund [investment] by the end of 2017.  I was informed by management recently that the fees were 'waived' for 2017."

167.    The investor also informed McKellar that the other Fund II investor was a client of Cambridge Associates, and that he was planning to instruct Cambridge Associates to "look into" Mithril.

168.    Because McKellar knew that Cambridge would soon be approached by one or more Mithril investors asking about Royan's fraud, McKellar reached out to Cambridge's Co-Head of U.S. Venture.  The Cambridge representative connected her to the Cambridge investment director who was spearheading the Mithril review.

169.    During the course of multiple telephonic and in-person discussions with the Cambridge investment director between April 1 and April 11, McKellar realized that Royan's lies were widespread and continuing.  Cambridge's investment director also noted that Cambridge had concerns not only about Royan's false statement that he had waived management fees but also about the internal movements and uses of the management fees within Mithril, and about the lack of competence or independence of the finance team, led by Royan's sister.

170.    The Cambridge representative said that these concerns would be reflected in a report provided to Cambridge's investor clients, and that Cambridge would also be recommending a full forensic audit of Mithril's finance operation, including around cash movements, investor communications, and valuations.

171.    The Cambridge representative also mentioned his belief that during a recent phone call, Royan had been dishonest about the reasons for his move to Texas (it was apparent to Cambridge that the move was for a tax benefit, not to source deals), and about the slow pace of investment (it was now apparent to Cambridge that this was because Royan did not have an adequate team in place to diligence potential investments, not because he was "disciplined").

**McKellar Asks that Thiel Take Action to Address the Fraud**

172.   On April 11, 2019, McKellar emailed Thiel and his in-house counsel.  McKellar had not spoken with Thiel since January.  McKellar relayed the news that matters at Mithril had gotten worse and that "investors [we]re mobilizing."  McKellar wrote that she had been in contact with multiple large Mithril investors who were incensed due to Royan's fraudulent behavior, and noted that Cambridge had recommended a full forensic audit of Mithril's finance operation. McKellar offered to meet with Thiel to discuss the situation and potential solutions.

173.   Thiel's in-house counsel called her almost immediately.  McKellar spoke with him again the next day as well as multiple times the following week.  McKellar expressed her view that Thiel needed to take action to protect Mithril's investors, and specifically that Thiel needed to exercise his side letter right to remove Royan as the General Partner of Mithril's funds and take the helm himself.  Thiel's in-house counsel explained that Thiel was concerned about making a major move like removing Royan as the General Partner unless he was certain that it was the right thing to do.

174.   Thiel's in-house counsel believed Thiel had spoken with Royan recently, and said that Thiel did not want a "war" with Royan.  He told McKellar that Thiel was particularly concerned at how Thiel's own friends and colleagues who were former Mithril employees had been mistreated by Royan.  McKellar was concerned that Royan was again lying to Thiel to deflect Thiel's concerns, and stated she would send Thiel an email setting out all of the relevant facts.  On April 19, 2019, McKellar sent the promised email to Thiel urging him to take action.

**Royan's Theft from Fund I Investors**

175.   Around this same time, McKellar realized that Royan's fraud extended to Fund I investors as well.  Fund I was outside the "Investment Period," which meant that management fees were no longer calculated as 2% of the total fund size.  Instead, Fund I management fees for 2018 were calculated as 1.9% of the cost basis of all investments minus realizations and writedowns.

176.   If Royan had properly marked down the cost basis of the Fund I company that Thiel, Leggett, and Royan had all agreed was worth "zero" during the January 2019 meeting, this would have reduced the management fee charged to Fund I investors in 2018 by approximately

1  $475,000.

2      177.    Royan's decision to artificially inflate the company's valuation permitted him to

3  steal almost a half a million dollars in unjustified management fees from Fund I investors.

4      178.    In addition, because Mithril calculates carried interest on a deal-by-deal basis and

5  deducts write-downs from the profits from which carried interest is calculated, Royan's fraudulent

6  act in failing to mark the company to zero also permitted him to improperly divert an additional

7  almost $5 million in unjustified carried interest from Mithril I investors in connection with the

8  Auris exit.

9    **McKellar Further Reports the Fraud to the SEC and United States Attorney's Office**

10   **and Assists in Their Investigations**

11      179.    Having received no response from Thiel, McKellar took further action to protect

12  the victims of Mithril's fraud.  On May 13, 2019, McKellar submitted a second whistleblower

13  complaint to the SEC that specifically identified McKellar as the complainant and provided a

14  detailed overview of the fraud.  The complaint described Royan's misrepresentations regarding (1)

15  the size of the investment team, (2) the slow deployment of capital, (3) the management fees

16  charged to investors, (4) Royan's personal commitment to the funds, and (5) artificially inflated

17  numbers in Mithril's financial statements.

18      180.    On May 14, 2019, McKellar attended an in-person meeting with two USAO

19  attorneys from the Corporate Fraud Task Force and an FBI agent.  McKellar truthfully answered

20  the government's questions about Royan's fraud and agreed to cooperate in their ongoing

21  investigation.

22      181.    McKellar indicated during this meeting that she was uncomfortable being

23  associated with Mithril and was considering ending her employment relationship with Mithril.

24  The government indicated such an action could compromise its ability to conduct an effective

25  covert investigation.  McKellar agreed not to change her employment status or do anything else

26  that might tip Royan off about the investigation.

27      182.    In mid-June 2019, McKellar attended an in-person meeting with the SEC.  An FBI

28  agent was also in attendance.  Again, McKellar truthfully answered the government's questions

about Royan's fraud.  McKellar repeated her desire to break ties with Mithril, and the FBI agent again noted that such an action could compromise its investigation.  McKellar again agreed to wait out of respect for the government's process.

183.    On June 27, 2019, the FBI agent leading the investigation asked McKellar to introduce her over email to a Fund II investor whom the FBI indicated it had selected in the hope that he would assist the government in the investigation.  McKellar agreed, and sent the following email introduction to the investor, cc'ing the FBI agent.  The text of the email had been agreed upon in advance between McKellar and the FBI agent:

From: **Crystal McKellar** <█████████████████████>
Date: Thu, Jun 27, 2019 at 6:58 PM
Subject: Regarding Mithril: please be discreet about this message
To: <█████████████████>
Cc: <███████@fbi.gov>

Dear ████,

I hope you and your family are having a nice beginning of summer.  I am writing to you now because after some press coverage about Mithril, the FBI has been looking into matters at the firm.

The FBI reached out to me, and I have shared my observations as well as the serious concerns that led to my departure from Mithril in February.

The FBI has also requested to have a discreet conversation with you.  And so I am introducing you to the FBI agent from ████████████████ who is looking into this matter, █████████.  I have found ███ to be extremely knowledgeable about the industry and to be focusing on all the right questions.

I believe ████ will be reaching out to you directly.  If you would like to contact ███ in the meantime, I have cc'd ███ here, and ████████████████████.

All the best,
Crystal

184.    On July 10, 2019, Thiel's profile disappeared from the Mithril website along with the entire team page.  The website was now just a landing page and investor login.  McKellar believed that Thiel might be distancing himself from Mithril and might be taking further actions.

185.    On July 15, 2019 McKellar learned that Mithril had learned of the investigation and the identity of the FBI agent who was leading the investigation and had contacted the agent on or

1    before that date.  On information and belief, the investor who McKellar had introduced to the FBI
2    agent tipped off Mithril about the existence of the government investigation.

3    **Mithril and Royan Retaliate against McKellar for Engaging in Protected Activity**

4    186.    Mithril's retaliation came swiftly.  On July 17, 2019, McKellar received a letter
5    from Mithril, signed by Kingsbury, claiming that she was in violation of her severance and
6    consulting agreements and that Mithril was terminating those agreements and forfeiting
7    McKellar's employment compensation, including her entire vested and unvested carried interest in
8    Fund I and Fund II.

9    187.    In a follow up letter dated July 23, 2019, Mithril admitted being aware of a
10   "purported FBI investigation" before it terminated McKellar on July 17, 2019.  Mithril's outside
11   counsel also acknowledged that he had personally spoken with the FBI agent leading the
12   investigation into Mithril on July 16 before Mithril terminated McKellar's employment.  On
13   information and belief, Mithril's outside counsel had additional contacts with the FBI that were
14   omitted in the July 23 letter and that occurred on or prior to July 15.

15   188.    On September 12, 2019, Vox published an article entitled "The FBI is investigating
16   a venture capital fund started by Peter Thiel for financial misconduct."  After this article came out,
17   a reporter from Bloomberg contacted McKellar stating that Mithril was telling journalists that
18   McKellar had engaged in extortion against the fund and that the government was investigating
19   McKellar, not Mithril.  McKellar told the reporter that this story was false and that she could not
20   comment on a pending government investigation.

21   189.    Mithril doubled down on this falsehood by disseminating it in the media.  When
22   addressing the publicly reported SEC and FBI investigations in September, Mithril indicated the
23   government investigation had been the result of "extortionate behavior" and a "foiled plot by a
24   self-serving ex-employee," falsely suggesting that McKellar was the one under investigation rather
25   than Mithril.  Mithril knew this statement was false based on its own communications with
26   government investigators, yet it repeated this lie to publicly disparage McKellar.

27

28

**Mithril and Royan Sue McKellar in Two Different States**

190.    Mithril sued McKellar in Texas state court on October 2, 2019.  Mithril falsely alleges that McKellar violated the non-compete, non-solicit, and non-disparagement provisions of the consulting and severance agreements.  The next day, on October 3, Royan took the stage at TechCrunch Disrupt to "make public" those allegations.

191.    On October 18, 2019, Mithril publicly sued McKellar again in Delaware state court purporting to seek a declaration that it was appropriate for Mithril to strip McKellar's carried interest worth in excess of $15 million in retaliation for reporting Mithril's fraud to the SEC and other government regulators.

192.    The Delaware complaint makes similar allegations but adds a false claim that McKellar intentionally destroyed Mithril documents and communications located on McKellar's "Mithril phone and laptop."

193.    As Mithril well knows, McKellar returned her "Mithril phone and laptop" to Mithril on February 20, 2019.  On that date Mithril gave McKellar a new phone and laptop with factory settings on which McKellar's personal photos and personal communications were transferred—a transfer that was carefully handled by Mithril's IT personnel under the watchful eyes of John Kingsbury.  No new Mithril information was loaded onto either device, and Mithril did not provide McKellar with confidential information after that date.

194.    The Mithril-related correspondence described herein generally occurred on McKellar's personal phone, on her personal phone number, and on a personal email address, and moreover has all been preserved and produced to the SEC and USAO.

195.    In its two lawsuits, Mithril claims that McKellar violated employment agreements by (1) working for a competing venture fund, (2) taking Mithril investment opportunities, and (3) soliciting Mithril investors for her new fund.  These allegations are false and serve as a pretext for Mithril's retaliation against McKellar.

196.    McKellar never worked for a competing venture fund when she worked for Mithril. While McKellar worked for a core U.S. long/short hedge fund investing exclusively in U.S. public equities, this was not a competing venture fund and was specifically permitted under her

1    employment agreement.

2        197.    Mithril also claims that McKellar violated the non-compete by launching her own

3 venture fund. But the formation date of McKellar's venture fund is October 25, 2019, over three

4 months *after* Mithril terminated her.

5        198.    During the time she worked for Mithril, McKellar never invested in a private

6 technology company without first offering the investment opportunity to Mithril. McKellar made

7 investments in two private technology companies in March 2019. In both cases McKellar

8 informed Royan in writing prior to making the investments, and in both cases offered Mithril a

9 right of first refusal (ROFR) over each investment.

10        199.    Mithril's complaint suggests McKellar did not give Mithril sufficient time to decide

11 whether to exercise the ROFR. This allegation is false. With respect to the first investment,

12 Kingsbury actually sent McKellar an email *confirming* that Mithril was not exercising its ROFR.

13        200.    McKellar never received a response to her email offering a ROFR on her second

14 investment. McKellar was not surprised that Royan did not respond regarding the second

15 investment, however, because Royan had *already* turned down the same investment opportunity

16 back in November 2018, stating in a text to McKellar "[w]e [Mithril] should pass, if not hard

17 pass…" Mithril's allegation that McKellar took Mithril investment opportunities for her own

18 fund, or for competing funds, is pretext for Mithril's retaliation.

19        201.    Finally, Mithril's allegation that McKellar solicited its investors for her new

20 venture fund is also false. She has not. In fact, in every instance in which McKellar has been

21 approached by Mithril investors seeking to invest in her new fund, she has informed them that she

22 could not solicit Mithril investors. McKellar has not accepted any Mithril investor as an investor

23 in her new fund.

**FIRST CAUSE OF ACTION**

**Dodd-Frank Whistleblower Retaliation**

**[15 U.S.C. § 78u-6(h)]**

**(Against Mithril Capital Management LLC and Ajay Royan)**

202.    McKellar repeats and realleges, and incorporate herein by reference, the allegations set forth in Paragraphs 1-201 above, as though fully set forth herein.

203.    McKellar was an employee of Mithril Capital Management LLC.

204.    Mithril Capital Management LLC and Royan are both considered employers for purposes of the whistleblower anti-retaliation provision of 15 U.S.C. § 78u-6(h).

205.    Mithril Capital Management LLC reports to the SEC as an "exempt reporting adviser" under Section 204(a) of the Investment Advisers Act and Rule 204-4 thereunder. Whether registered or exempt, all investment advisors are subject to section 206 of the Investment Advisers Act, 15 U.S.C. § 80b-6, which establishes a federal fiduciary duty for investment advisors.

206.    Section 206(1) prohibits investment advisers from employing "any device, scheme, or artifice to defraud any client or prospective client."  15 U.S.C. § 80b-6(1).  Section 206(2) prohibits investment advisers from engaging "in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client." *Id.* § 80b-6(2).  Section 206(4) prohibits investment advisers from engaging "in any act, practice, or course of business which is fraudulent, deceptive, or manipulative." *Id.* § 80b-6(4); *see also* 17 C.F.R. § 275.206(4)-8 (specifically prohibiting advisers to pooled investment vehicles from making false or misleading statements or otherwise engaging in "any act, practice, or course of business that is fraudulent, deceptive, or manipulative with respect to any investor or prospective investor in the pooled investment vehicle").

207.    Mithril Capital Management LLC and Royan violated section 206 of the Investment Advisers Act, among other laws and regulations within the jurisdiction of the SEC, by failing to advance the best interest of investors and by making numerous, repeated misrepresentations described more fully above.

1   208.   McKellar provided information to the SEC in accordance with 15 U.S.C. § 78u-6.

2   209.   McKellar initiated, testified in, and assisted in an investigation or judicial or

3   administrative action of the SEC based upon or related to information that McKellar provided to

4   the SEC.

5   210.   McKellar made disclosures that were required or protected under the Sarbanes-

6   Oxley Act of 2002 (15 U.S.C. 7201 *et seq.*), the Securities and Exchange Act of 1934, including

7   15 U.S.C. section 78j-1(m), section 1513(e) of title 18, and other laws, rules, or regulations subject

8   to the jurisdiction of the SEC.

9   211.   McKellar had both a subjectively and objectively reasonable belief that the conduct

10   being reported violated a listed law, rule, or regulation.

11   212.   Mithril Capital Management LLC and Royan knew or suspected that McKellar

12   engaged in such protected activity.

13   213.   McKellar was terminated.

14   214.   McKellar's protected activity discussed above was a contributing factor—and

15   indeed the reason for—her termination.

16   215.   As a proximate result of Mithril Capital Management LLC's and Royan's actions

17   against McKellar, as alleged above, McKellar has been harmed in that he has suffered the loss of

18   wages, benefits, and additional amounts of money she would have received if she had not been

19   subjected to said treatment.  McKellar has also been harmed in that she has suffered humiliation,

20   mental anguish, and emotional and physical distress.  As a result of such conduct, McKellar has

21   suffered damages in an amount according to proof.

22   **SECOND CAUSE OF ACTION**

23   **California Whistleblower Retaliation**

24   **[Labor Code § 1102.5]**

25   **(Against Mithril Capital Management LLC)**

26   216.   McKellar repeats and realleges, and incorporate herein by reference, the allegations

27   set forth in Paragraphs 1-201 above, as though fully set forth herein.

28   217.   McKellar was an employee of Mithril Capital Management LLC.

218.   Mithril Capital Management LLC terminated McKellar.

219.   A substantial motivating reason for McKellar's termination was her reporting to the SEC, USAO, and FBI of violations of federal securities laws as set forth above, and related misconduct, as well as refusing to participate in Royan's attempts affirmatively cover up such misconduct.

220.   As a proximate result of these actions against McKellar, as alleged above, she has been harmed in that she has suffered the loss of wages, benefits, and additional amounts of money he would have received if he had not been subjected to said treatment.

221.   McKellar has also been harmed in that she has suffered humiliation, mental anguish, and emotional and physical distress.  As a result of such conduct, McKellar has suffered damages in an amount according to proof.

222.   McKellar was terminated for engaging in activity protected by Dodd-Frank, 15 U.S.C. § 78u-6, and for refusing to aid and abed or be an accessory after the fact to violations of federal securities laws.

223.   McKellar expressly excludes from the scope of this claim any action of Mithril Capital Management LLC arising from any act of that person in furtherance of that person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue.

**THIRD CAUSE OF ACTION**

**Wrongful Discharge in Violation of Public Policy**

**(Against Mithril Capital Management LLC)**

224.   McKellar repeats and realleges, and incorporate herein by reference, the allegations set forth in Paragraphs 1-201 above, as though fully set forth herein.

225.   McKellar was an employee of Mithril Capital Management LLC.

226.   Mithril Capital Management LLC terminated McKellar.

227.   McKellar reported to the SEC, USAO, and FBI violations of federal securities laws as set forth above, and related misconduct, and she refused to participate in Royan's attempts affirmatively cover up such misconduct.

228.   McKellar's reporting to the SEC, USAO, and FBI was a contributing factor in Mithril's decision to terminate McKellar.

229.   As a proximate result of these actions against McKellar, as alleged above, McKellar has been harmed in that she has suffered the loss of wages, benefits, and additional amounts of money she would have received if she had not been subjected to said treatment. McKellar has also been harmed in that she has suffered humiliation, mental anguish, and emotional and physical distress.  As a result of such conduct, McKellar has suffered damages in an amount according to proof.

230.   McKellar was terminated for engaging in activity protected by Dodd-Frank, 15 U.S.C. § 78u-6, and for refusing to aid and abed or be an accessory after the fact to violations of federal securities laws.

231.   McKellar expressly excludes from the scope of this claim any action of Mithril Capital Management LLC arising from any act of that person in furtherance of that person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue.

### FOURTH CAUSE OF ACTION

#### Nonpayment of Wages

#### [Labor Code §§ 201, 202, 208]

#### (Against Mithril Capital Management LLC)

232.   McKellar repeats and realleges, and incorporate herein by reference, the allegations set forth in Paragraphs 1-201 above, as though fully set forth herein.

233.   McKellar performed work for Mithril Capital Management LLC.

234.   Mithril Capital Management LLC owes McKellar wages under the terms of the employment.

235.   Mithril Capital Management LLC has failed to pay McKellar the wages she is owed.

**FIFTH CAUSE OF ACTION**

**Breach of Contract**

**(Against Mithril Capital Management LLC)**

236.   McKellar repeats and realleges, and incorporate herein by reference, the allegations set forth in Paragraphs 1-201 above, as though fully set forth herein.

237.   McKellar and Mithril Capital Management LLC entered into a consulting agreement and a separation agreement, both of which were dated February 11, 2019.

238.   McKellar performed as required by the contracts.

239.   Mithril Capital Management LLC breached the contracts by wrongfully stripping McKellar of employment benefits provided by the contracts, including her 4.5% carried interest in Fund I and her 0.5% carried interest in Fund II.

240.   McKellar was harmed by these breaches, including without limitation by the conduct set forth in the letter from Mithril Capital Management LLC to McKellar dated July 17, 2019.

241.   Mithril Capital Management LLC's conduct was a substantial factor in causing McKellar's harm.

**SIXTH CAUSE OF ACTION**

**Breach of the Implied Covenant of Good Faith and Fair Dealing**

**(Against Mithril Capital Management LLC)**

242.   McKellar repeats and realleges, and incorporate herein by reference, the allegations set forth in Paragraphs 1-201 above, as though fully set forth herein.

243.   McKellar and Mithril Capital Management LLC entered into a consulting agreement and a separation agreement, both of which were dated February 11, 2019.

244.   McKellar performed as required by the contracts.

245.   Mithril Capital Management LLC unfairly interfered with McKellar's right to receive the benefits of the contracts by wrongfully stripping McKellar of employment benefits provided by the contracts, including her 4.5% carried interest in Fund I and her 0.5% carried interest in Fund II.

246.    McKellar was harmed by this interference, including without limitation by the conduct set forth in the letter from Mithril Capital Management LLC to McKellar dated July 17, 2019.

247.    Mithril Capital Management LLC's conduct was a substantial factor in causing McKellar's harm.

## SEVENTH CAUSE OF ACTION

### Breach of LLC Agreement

### (Against Mithril GP Employee Feeder LLC)

248.    McKellar repeats and realleges, and incorporate herein by reference, the allegations set forth in Paragraphs 1-201 above, as though fully set forth herein.

249.    McKellar was confirmed as a Professional Member of Mithril GP Employee Feeder LLC by letter dated March 28, 2014 (Admission Letter).  The Admission Letter cross-referenced the Amended and Restated Limited Liability Agreement of Mithril GP Employee Feeder LLC dated March 28, 2014 (LLC Agreement).

250.    McKellar performed as required by the Admission Letter and LLC Agreement.

251.    Mithril GP Employee Feeder LLC breached the Admission Letter and LLC Agreement by wrongfully stripping McKellar of employment benefits provided by the Admission Letter and LLC Agreement, including her vested 3.0% carried interest in Fund I.

252.    McKellar was harmed by these breaches.

253.    Mithril GP Employee Feeder LLC's conduct was a substantial factor in causing McKellar's harm.

## EIGHTH CAUSE OF ACTION

### Statutory Unfair Competition

### [Bus. & Prof. Code § 17200]

### (Against Mithril Capital Management LLC, Mithril GP Employee Feeder LLC,

### and Ajay Royan)

254.    McKellar repeats and realleges, and incorporate herein by reference, the allegations set forth in Paragraphs 1-201 above, as though fully set forth herein.

255.   Mithril Capital Management LLC, Mithril GP Employee Feeder LLC, and Royan have engaged in unfair competition in the form of unlawful, unfair, and fraudulent business acts or practices as set forth above.   Their conduct is unlawful for the reasons explained in the other counts of the complaint, including violation of the Dodd-Frank whistleblower retaliation statute, 15 U.S.C. § 78u-6(h).   Their conduct is unfair because it offends an established public or legislatively declared policy, and the practice is immoral, unethical, oppressive, unscrupulous, and substantially injurious.   Their conduct is fraudulent for the reasons explained above and because Defendants' representations are likely to deceive the public.

256.   McKellar suffered injury in fact and lost money or property as a result of the unfair competition by Mithril Capital Management LLC, Mithril GP Employee Feeder LLC, and Royan.

257.   McKellar seeks restitution and injunctive relief to remedy the injuries caused by the unfair competition.

258.   McKellar expressly excludes from the scope of this claim any action of Mithril Capital Management LLC, Mithril GP Employee Feeder LLC, and Ajay Royan arising from any act of those persons in furtherance of those persons' rights of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue.

## NINTH CAUSE OF ACTION

### Declaratory Relief

### (Against Mithril Capital Management LLC, Mithril GP Employee Feeder LLC, and Ajay Royan)

259.   McKellar repeats and realleges, and incorporate herein by reference, the allegations set forth in Paragraphs 1-201 above, as though fully set forth herein.

260.   Multiple actual controversies and disputes exist between McKellar, on the one hand, and Mithril Capital Management LLC, Mithril GP Employee Feeder LLC, and Royan, on the other hand, for the reasons set forth above.

261.   McKellar seeks the following declaratory relief:

- A declaration that the non-compete, non-solicit, and non-disparagement provisions in the employment contracts that Defendants seek to enforce, and

in the Mithril GP Employee Feeder LLC Agreement, are subject to California law and are illegal and unenforceable.

- If the Court finds the non-compete, non-solicit, and non-disparagement provisions in the employment contracts that Defendants seek to enforce, and in the Mithril GP Employee Feeder LLC Agreement, are enforceable, a declaration that McKellar did not violate them.

- A declaration that the foreign (non-California) choice-of-law provisions in the employment contracts that Defendants seek to enforce, and in the Mithril GP Employee Feeder LLC Agreement, are illegal and unenforceable.

- A declaration that the lawsuits Mithril Capital Management LLC and Mithril GP Employee Feeder LLC filed in Texas and Delaware, respectively, against McKellar regarding the subject matter of this action, violate Cal. Bus. & Prof. Code § 16600 and Cal. Labor Code § 925 and are illegal.

- A declaration that McKellar did not violate the Mithril GP Employee Feeder LLC Agreement, and that Mithril GP Employee Feeder LLC violated the LLC Agreement by stripping McKellar of her carried interest.

- A declaration that McKellar was an employee of Mithril Capital Management LLC until her termination on July 17, 2019.

- A declaration that Defendants' actions and employment contracts, and the Mithril GP Employee Feeder LLC Agreement, violate SEC Rule 21F-17, 17 CFR § 240.21F-17, that Defendants' actions in violation of that regulation are illegal, and that Defendants' contractual and LLC provisions in violation of that regulation are unenforceable.

- Any other declaratory relief necessary to afford McKellar complete relief in connection with the claims asserted in this action.

**TENTH CAUSE OF ACTION**

**Injunctive Relief**

**(Against Mithril Capital Management LLC, Mithril GP Employee Feeder LLC,**

**and Ajay Royan)**

262.    McKellar repeats and realleges, and incorporate herein by reference, the allegations set forth in Paragraphs 1-201 above, as though fully set forth herein.

263.    McKellar seeks the following injunctive relief:

- An injunction prohibiting Mithril Capital Management LLC and Mithril GP Employee Feeder LLC from prosecuting the lawsuits filed in Texas and Delaware against McKellar regarding the subject matter of this action, and an injunction mandating that Defendants dismiss such lawsuits, because they violate Cal. Bus. & Prof. Code § 16600 and Cal. Labor Code § 925.

- An injunction prohibiting Defendants from enforcing the non-compete, non-solicit, and non-disparagement provisions in the employment contracts that Defendants seek to enforce, and in the Mithril GP Employee Feeder LLC Agreement, because they violate Cal. Bus. & Prof. Code § 16600 and Cal. Labor Code § 925.

- An injunction prohibiting Defendants from enforcing the foreign (non-California) choice-of-law provisions in the employment contracts that Defendants seek to enforce, and in the Mithril GP Employee Feeder LLC Agreement,  because they violate Cal. Bus. & Prof. Code § 16600 and Cal. Labor Code § 925.

- An injunction prohibiting Defendants from taking further actions or enforcing contractual or LLC provisions that violate SEC Rule 21F-17, 17 CFR § 240.21F-17.

- An injunction ordering Defendants to provide restitution to McKellar, including without limitation restoring McKellar's carried interest in Fund I and Fund II pursuant to Cal. Bus. & Prof. Code § 17200.

- Any other injunctive relief necessary to afford McKellar complete relief in connection with the claims asserted in this action.

## DEMAND FOR JURY TRIAL

264. McKellar demands a jury trial on all causes of action to the maximum extent permitted by law.

## PRAYER FOR RELIEF

McKellar prays for judgment as follows:

1.  For compensatory damages according to proof but not less than fifteen million dollars ($15,000,000);

2.  For mandatory doubling of the compensatory damages according to proof, pursuant to 15 U.S.C. § 78u-6(h)(1)(C), but not less than an additional fifteen million dollars ($15,000,000);

3.  For punitive and exemplary damages according to proof but not less than an additional thirty million dollars ($30,000,000);

4.  For consequential damages according to proof;

5.  For damages for mental suffering, loss of enjoyment of life, inconvenience, grief, anxiety, humiliation, and emotional distress according to proof;

6.  For declaratory relief;

7.  For preliminary and permanent injunctive relief;

8.  For costs of suit;

9.  For pre-judgment and post-judgement interest;

10. For attorney fees, litigation costs, and expert witness fees, including without limitation an award of attorney fees as provided by 15 U.S.C. § 78u-6(h)(1)(C) and California Labor Code § 218.5; and

11. For any and all further relief as this Court may deem appropriate.

1    DATED:   November 7, 2019          EVERSHEDS SUTHERLAND (US) LLP

2

3                                       By */s/ Ian S. Shelton*
                                          _____
4                                          Ian S. Shelton (Bar No. 264863)
                                           500 Capitol Mall, Suite 2350
                                           Sacramento, California 95814
5                                          Telephone:    (916) 844-2965
                                           Facsimile:    (916) 241-0501
6
                                           David A. Baay (*Pro Hac Vice* Forthcoming)
7                                          1001 Fannin, Suite 3700
                                           Houston, Texas 77002
8                                          Telephone:    (713) 470-6100
                                           Facsimile:    (713) 654-1301
9

10                                         Attorneys for Plaintiff Crystal McKellar

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28