EVERSHEDS SUTHERLAND (US) LLP
Ian S. Shelton (Bar No. 264863)
(ianshelton@eversheds-sutherland.com)
500 Capitol Mall, Suite 2350
Sacramento, California 95814
Telephone:    (916) 844-2965
Facsimile:    (916) 241-0501

EVERSHEDS SUTHERLAND (US) LLP
David A. Baay (*pro hac vice* forthcoming)
(davidbaay@eversheds-sutherland.com)
1001 Fannin, Suite 3700
Houston, Texas 77002
Telephone:    (713) 470-6100
Facsimile:    (713) 654-1301

Attorneys for Plaintiff Crystal McKellar

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA—SAN FRANCISCO DIVISION

| | |
|---|---|
| CRYSTAL SCRIPPS MCKELLAR,<br><br>             Plaintiff,<br><br>    vs.<br><br>MITHRIL CAPITAL MANAGEMENT LLC, MITHRIL GP EMPLOYEE FEEDER LLC, and AJAY ROYAN,<br><br>             Defendants. | CASE NO. 3:19-cv-07314-CRB<br><br>Hon. Charles R. Breyer<br><br>**DECLARATION OF CRYSTAL MCKELLAR IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date:         February 28, 2020<br>Time          10:00 a.m.<br>Courtroom:    6 (17th Floor)<br>Address:      San Francisco Courthouse<br>              450 Golden Gate Avenue<br>              San Francisco, CA 94102 |

DECLARATION OF CRYSTAL MCKELLAR

I, Crystal Scripps McKellar, declare as follows:

1. I am over 21 years of age and am fully competent to make this declaration. I have personal knowledge of the facts stated in this declaration in support of my motion for preliminary injunction, and if called upon to testify I could and would testify competently as to the truth of the facts stated herein.

2. I am a former employee of Mithril Capital Management LLC ("Mithril"). I was employed by Mithril from June 14, 2012 until July 17, 2019.

**Exhibits**

3. I have filed a complaint in the United States District Court for the Northern District of California bearing Case No. 3:19-cv-07314 and styled *Crystal Scripps McKellar v. Mithril Capital Management LLC, Mithril GP Employee Feeder LLC, and Ajay Royan*. I have read this complaint and verify that the facts stated in it are true and correct and within my personal knowledge.

4. Attached hereto as **Exhibit A** is a true and correct copy of the complaint filed by Mithril in Texas state court on October 2, 2019 ("Texas Action"). My counsel removed the Texas Action to the Western District of Texas on November 7, 2019.

5. Attached hereto as **Exhibit B** is a true and correct copy of the complaint filed by Mithril GP Employee Feeder LLC ("Feeder") in Delaware state court on October 18, 2019 ("Delaware Action"). My counsel removed the Delaware Action to the District of Delaware on November 15, 2019. Feeder attached two exhibits to its Delaware Complaint. A true and correct copy of The Amended and Restated Limited Liability Company Agreement of Mithril GP Employee Feeder LLC, dated March 28, 2014, is attached as **Exhibit B-1**. A true and correct copy of the admission letter, dated February 11, 2019, signed by Ajay Royan ("Royan") and me in California ("2019 Admission Letter"), is attached as **Exhibit B-2**.

6. Attached hereto as **Exhibit C** is a true and correct copy of Mithril's employment offer letter, dated June 25, 2012, signed by Royan and me in California.

7. Attached hereto as **Exhibit D** is a true and correct copy of the admission letter, dated

March 28, 2014, signed by Royan and me in California ("2014 Admission Letter").

8. Attached hereto as **Exhibit E** is a true and correct copy of the Separation Agreement and General Release, dated February 11, 2019, signed by Royan and me in California ("Separation Agreement").

9. Attached hereto as **Exhibit F** is a true and correct copy of the Consulting Agreement with attachments, dated February 11, 2019, signed by Royan and me in California ("Consulting Agreement").

10. Attached hereto as **Exhibit G** is a true and correct copy of a text message exchange between Royan and me on February 12, 2019 regarding the employment agreements. The text messages are shown in Coordinated Universal Time (UTC), also known as Greenwich Mean Time.

11. Attached hereto as **Exhibit H** is a true and correct copy of an email exchange between Royan and me on February 11-12, 2019 regarding the employment agreements.

12. Attached hereto as **Exhibit I** is a true and correct copy of an email exchange between Royan's Chief of Staff John Kingsbury ("Kingsbury") and me on February 27, 2019.

13. Attached hereto as **Exhibit J** is a true and correct copy of an email exchange, dated March 11, 2019, between Kingsbury and me.

14. Attached hereto as **Exhibit K** is a true and correct copy of a text exchange between Paul Leggett and me between February 26, 2019 and March 4, 2019.

15. Attached hereto as **Exhibit L** is a true and correct copy of an email I sent to Royan on March 18, 2019 regarding a potential investment relating to Mithril's right of first refusal under the Consulting Agreement.

16. Attached hereto as **Exhibit M** is a true and correct copy of an email, dated March 20, 2019, from Kingsbury in response to my March 18, 2019 email. Kingsbury stated that Mithril would not be exercising its right of first refusal in connection with the potential investment I had identified in my March 18, 2019 email.

17. Attached hereto as **Exhibit N** is a true and correct copy of an email exchange between Kingsbury and me in March 2019.

18. Attached hereto as **Exhibit O** is a true and correct copy of a letter, dated July 21, 2019, from my counsel to Kingsbury regarding my cooperation with the government investigations.

19. Attached hereto as **Exhibit P** is a true and correct copy of a letter, dated July 23, 2019, written by Mithril's counsel in response to the July 21, 2019 letter from my counsel.

20. Attached hereto as **Exhibit Q** is a true and correct copy of the termination letter, dated July 17, 2019, that I received from Kingsbury.

21. Attached hereto as **Exhibit R** is a true and correct copy of the January 14, 2020 letter from my counsel to the counsel for Feeder and Mithril, in which I invoke my rights pursuant to California Labor Code § 925.

22. Attached hereto as **Exhibit S** is a true and correct copy of the letters to Feeder and Mithril requesting advancement of my defense costs associated with the Delaware and Texas Actions, respectively, under the LLC Agreement.

23. Attached hereto as **Exhibit T** is a true and correct copy of the letters I received from Feeder and Mithril rejecting my demands for advancement.

24. Attached hereto as **Exhibit U** is a true and correct excerpt of the U.S. District Court—Judicial Caseload Profiles for Delaware, the Western District of Texas, and the Northern District of California, downloaded from the U.S. Courts website at https://www.uscourts.gov/federal-court-management-statistics-september-2019.

25. Attached hereto as **Exhibit V** is a true and correct copy of a declaration signed by Royan in the Delaware Action, dated December 16, 2019 and signed in Toronto, Ontario, Canada.

### Background Facts

26. I am a citizen of California and resident of San Francisco. I was a citizen and California and resident of San Francisco during all events relevant to this lawsuit, including from June 2012 to the present day.

27. From June 2012 through July 2019, I was an employee of Mithril, a venture capital firm founded in San Francisco, California and managed solely by Royan. At all times during my employment, I resided and worked in San Francisco, California.

28. In late 2018 and early 2019, I learned that Royan and Mithril had engaged in securities fraud. I discovered that Royan lied repeatedly about Mithril in investor meetings, in its financial statements, on its website, and in published interviews with the press. Royan lied regarding the management fees he had charged investors, the valuations of portfolio companies, the size of his investment team, the true reason for Fund II's slow deployment of capital, and the size of his personal investment in Mithril's funds. Royan also falsely inflated the valuations of impaired portfolio companies in reported financials, which enabled him to pilfer hundreds of thousands of dollars in unearned management fees and millions of dollars in unjustified carried interest from investors.

29. After I was unable to accomplish corrective action from the inside, I disclosed the fraud to the Securities and Exchange Commission ("SEC") and reported this information to Mithril's outside auditor in March 2019. I reported the fraud to the SEC again in May 2019.

30. I also had in-person meetings with members of the Corporate Fraud Strike Force at the United States Attorney's Office for the Northern District of California ("USAO") and the Federal Bureau of Investigation ("FBI") in May 2019. At the SEC's request, I had an in-person meeting with the SEC in June 2019, which was also attended by the FBI. I also produced documents to both agencies pursuant to subpoenas from the SEC and USAO. I have been fully cooperating with these ongoing investigations, including most recently through another in-person meeting with the SEC in December 2019. I believe these investigations are necessary to protect the interests of Mithril's defrauded investors. My cooperation with the SEC, USAO, and FBI investigations occurred in the Northern District of California.

31. My correspondence relating to Mithril's fraud generally occurred on my personal phone and email, and have been produced to the SEC and USAO located in the Northern District of California. None of my communications were directed to Delaware or Texas.

32. After Mithril learned about my cooperation with the government, Mithril retaliated against me, terminating my employment and stripping me of my cash compensation, health care

coverage, and my carried interest worth in excess of $15 million. Thereafter, Feeder and Mithril sued me in Delaware and Texas—two states where I have never worked—claiming that my cooperation with the federal law enforcement obligations violated the LLC Agreement (Delaware Action) and the Separation and Consulting Agreements (Texas Action).

33. Royan publicly announced Mithril's Texas lawsuit against me onstage at a large technology conference in San Francisco, California on October 3, 2019, prior to serving me or contacting my attorneys to inform me of the lawsuit.

### The Agreements

34. I executed the 2014 Admission Letter in San Francisco, California. I was not represented by legal counsel in negotiating the terms of that agreement.

35. At 1:14 a.m. on the early morning of February 12, 2019, I executed the Separation Agreement, the Consulting Agreement (including the attachments), and the 2019 Admission Letter in Mithril's San Francisco office, while I was physically monitored by Kingsbury. I was not represented by legal counsel in negotiating the terms of those agreements.

36. Mithril had not yet moved into its Texas office and still maintained its office in San Francisco on February 11 and 12, 2019.

### The False and Pretextual Allegations in the Texas and Delaware Actions

37. The complaints in the Texas and Delaware Actions vaguely allude to "allegations about Mithril's finances" that I allegedly made to "one of Mithril's longest standing financial service providers." The subject matter of my communications to Mithril's outside auditor was Royan's fraudulent statements concerning waived management fees in 2017 (which were not waived). I reported that fraud and produced related documents to the government in furtherance of their investigations in California. None of the events relevant to my communications with Mithril's outside auditor occurred in Texas or Delaware.

38. The complaints in the Texas and Delaware Actions vaguely state that I wrote letters to "a major Mithril portfolio company" to "sow discord between Mithril and its business

DECLARATION OF CRYSTAL MCKELLAR

partners." The subject matter of my communications was Royan's fraudulent statements about the portfolio company, including false statements made to Mithril's investors and about the performance of the portfolio company that was publicly reported in a February 28, 2019 Fortune Magazine article. Royan sat on the board of that portfolio company and knew his statements were false when made. I reported that fraud and produced related documents to the government in furtherance of their investigations in California. None of the events relevant to my communications with the portfolio company occurred in Texas or Delaware.

39. The complaints in the Texas and Delaware Actions vaguely state that I "falsely disparaged Mithril to its counterparties." The subject matter of my communications with Mithril's investors—which were conducted over email, text message, telephone, and in-person meetings and not anonymous—was Royan's fraudulent statements about the topics identified in paragraph 4 of my California complaint. I reported that fraud and produced related documents to the government in furtherance of their investigations in California. None of the events relevant to my communications with Mithril's investors occurred in Texas or Delaware.

40. I never worked for a competing venture capital fund when I worked for Mithril. I did perform work for a San Francisco-based core U.S. long/short hedge fund ("SF Hedge Fund"), which invests exclusively in U.S. public equities. All of my work for the SF Hedge Fund was performed in California.

41. Over three months after Mithril terminated me, I formed a new venture capital fund named Anathem Ventures on October 24, 2019. Anathem Ventures is based in San Francisco, California. All of my actions or conduct relating to its formation and operation occurred in California.

42. During the time I worked for Mithril in California and thereafter, I never invested in a Mithril LP ("Fund I") investment opportunity. By January 4, 2017, Fund I was fully invested and no longer considering new investments.

43. I never solicited Mithril investors for my new venture capital fund named Anathem

Ventures. Though I made a public announcement to my contact list regarding my upcoming new fund in order to distance myself from Mithril's fraud, in every instance in which I was approached by Mithril investors to invest in my new fund, I informed them that I could not solicit Mithril investors. I have not accepted any Mithril investor as an investor of my new fund. All of my communications with Mithril investors occurred in California.

44. The restrictive covenants in the LLC Agreement are limited to actions taken in connection with Fund I. In the Delaware Action, Feeder broadly argues that I violated a non-compete covenant, but it identifies no Fund I opportunity I allegedly acquired and only identifies investment opportunities that surfaced over a year after Fund I was no longer making new investments. Feeder argues that I violated a non-solicitation covenant, but it identifies no Fund I investors (or any particular investors) I allegedly solicited. Feeder argues that I violated confidentiality and non-disparagement covenants by communicating with third parties about Royan's fraud—and then producing that same evidence to federal investigators—but the LLC Agreement expressly authorizes cooperation with such investigations.

### **My Mithril Employment**

45. I was a senior member of Mithril's investment team, managed investor relationships, served on the boards of certain portfolio companies, and held the title of Managing Director from June 14, 2012 through February 11, 2019.

46. My primary responsibilities involved sourcing and managing investments, maintaining Mithril's investor relationships, and serving as a board member at Mithril's portfolio companies. Although I also served as Mithril's General Counsel, I spent the vast majority of my time at Mithril performing non-legal job functions related to Mithril's investment activities and communications with Mithril's investors. This was particularly true after May 2013, when Royan hired an Associate General Counsel to handle most legal functions at the firm.

47. I was a Mithril employee and California resident when I signed the Separation and

Consulting Agreements and the 2019 Admission Letter dated February 11, 2019. I continue to reside and work in San Francisco, California to this day. Mithril had not yet moved into its Texas office and still maintained its office in San Francisco in February 11, 2019.

48. I was not in fact individually represented by legal counsel in negotiating the terms of the Separation Agreement, the Consulting Agreement, or the 2019 Admission Letter (or any other employment contract dated February 11, 2019).

49. Neither I nor my legal counsel was involved in negotiating the terms of the Separation Agreement, the Consulting Agreement, or the 2019 Admission Letter (or any other employment contract dated February 11, 2019). Royan informed me after business hours on the evening of February 11, 2019 that he would be presenting me with the contracts on a take-it-or-leave-it basis. Royan did not give me the opportunity to retain a qualified employment attorney or negotiate terms of the contract. Royan stated that the deal was off if I did not sign the contracts on the same day (February 11, 2019).

50. Royan sent me the contracts, which cross-referenced each other, to review piecemeal beginning at 11:22 p.m. on February 11, 2019, and did not send the full set until 12:58 a.m. on February 12, 2019. He continued pressuring me to sign them that same night, even though it was now technically past February 11, texting me, "We should be good on Hawaii time. Which is the only time zone that matters. Or Alaska."

51. I signed the contracts 16 minutes later at 1:14 a.m. while I sat in Mithril's San Francisco office, and while I was being physically monitored by Kingsbury. Royan provided the countersigned set of contracts to me at 1:37 a.m.

52. I was not represented by legal counsel during the 16 minute period that elapsed between when Royan sent me the full set of contracts and when I returned them—indeed, given the way in which Royan engineered the timing, it would have been impossible for me to consult with counsel.

53. Nor did I negotiate any terms of the contracts presented to me piecemeal between 11:22 p.m. and 12:58 a.m. I corrected the date and my address in the Consulting Agreement and

signed the Separation Agreement and the 2019 Admission Letter without any changes. Royan and I never discussed the non-California choice of law and choice of forum provisions in the contracts at any time.

54. The 2019 Admission Letter increased my carried interest in Fund I from 3% to 4.5%, which was a modification of my employment compensation under the LLC Agreement.

55. The Consulting Agreement stated that I would provide "advisory services in connection with management of the Company's portfolios for the term of this Agreement"—many of the same non-legal job functions I had as a Mithril employee.

56. The Consulting Agreement stated that my title would be "Advisory Managing Director"—similar to the "Managing Director" title I held as a Mithril employee (Royan subsequently confirmed in writing that I could continue using the title "Managing Director" after February 11, 2019).

57. The Consulting Agreement stated that I was "required to report directly to Ajay Royan or his designee" and "provide [my] services in accordance with the instructions therefrom and with such reasonable instructions given to Consultant by any other member or officer of the Company"—the same level of direct supervision and control to which I was subject as a Mithril employee. It further stated the term of the engagement was a full year and subject to extension by Mithril—not by job or task.

58. The Consulting Agreement stated that the engagement could be terminated by either party for any reason, with or without cause—the same at-will relationship I had as a Mithril employee.

59. The Consulting Agreement stated that I would be paid a monthly lump sum without regard to the work performed or results achieved—the same type of regular salaried payment I had as a Mithril employee. The monthly payment under the Consulting Agreement combined with the monthly payment under the Separation Agreement equaled the annual salary that I was promised by Royan before February 11, 2019. Mithril also continued to pay for my health insurance costs after February 2019—a benefit I had as a Mithril employee.

60. After February 11, 2019, I did not serve as General Counsel for Mithril, but I continued to perform many of the same non-legal job functions that I performed at Mithril prior to February 11.

61. From February 11-26, 2019, I worked in Mithril's San Francisco office under the direction and supervision of Kingsbury, who acted as Royan's proxy.  I had multiple meetings in which I walked Kingsbury through issues with Mithril's investment portfolio and investors—issues that fall within Mithril's core business functions.  I participated in calls and addressed issues regarding Mithril's portfolio companies.  I never traveled to Texas or Delaware in connection with my obligations under the Separation or Consulting Agreements.

62. After February 26, 2019, I continued to work for Mithril remotely from home and used my email address to communicate with Mithril's portfolio companies and potential investments.  Mithril provided me with a phone and laptop and provided me with access to a server to facilitate sharing Mithril documents.

63. In written correspondence, Kingsbury instructed me to continue my correspondence with Mithril's investors and portfolio companies, with Kingsbury and another Mithril employee copied.  Although I had become convinced of Royan's fraud by March 2019, I continued to perform work for Mithril while cooperating with the government investigations, and Kingsbury continued to request assistance with matters that were consistent with my past work as a Mithril employee before February 11.

64. For example, I provided assistance and advice to Mithril portfolio companies, just as I had as an employee.  Kingsbury requested assistance with a nondisclosure agreement in connection with Mithril's diligence of a prospective investment and other projects.  I also attempted to participate in weekly investment team meetings, but I was told by a Mithril employee that such team meetings had been cancelled for everyone.  I also communicated with Kingsbury regarding various deadlines associated with Mithril's investments in portfolio companies.

65. Between February and July 2019, I kept my title of Managing Director—the same title I

held as a Mithril employee before February 11.  I represented myself in this manner with Mithril's and Royan's full knowledge.  Royan specifically approved my use of this title in writing, and I communicated with Kingsbury and Royan using this title in my email signature block without objection from anyone at Mithril.

66. On February 12, 2019, Royan confirmed that I should continue using the title "Managing Director," notwithstanding the different title of "Advisory Managing Director" in the Consulting Agreement.  My email to Royan stated "I look forward to our continuing relationship," and Royan responded "I am confirming your understanding of the title usage as below," and he signed off with "Very best wishes."  I used the title "Managing Director" in my signature block in emails to Kingbury on February 26 and 27 and March 5 and 19, 2019.  The signature block read, "Crystal McKellar, Managing Director, Mithril Capital Management."  I used the same signature block in an email to Royan and Kingsbury on March 18, when I offered and Mithril declined a right of first refusal ("ROFR") on an investment that Mithril now claims I took from Mithril.  Never once did Kingsbury or Royan object to my use of the "Managing Director" title until the pretextual termination letter on July 17, 2019.

67. Between February 11, 2019 and July 17, 2019, my work was part of Mithril's regular business, Mithril supplied the equipment and tools for my work, my work was performed at Mithril's direction, I was paid the equivalent of a monthly salary, and my work was performed over an extended period of time.

68. Between February 11, 2019 and July 17, 2019, I was not free from the control and direction of Mithril in connection with the performance of my work.

69. Between February 11, 2019 and July 17, 2019, I was not performing work for Mithril that was outside the usual course of Mithril's business.

70. Between February 11, 2019 and July 17, 2019, I was not customarily engaged in an independently established trade, occupation, or business of the same nature as the work I performed for Mithril.

### No Delaware Contacts

71. I do not reside in Delaware, and I have never traveled to Delaware in connection with my obligations under the LLC Agreement or the 2019 Admission Letter.

72. I have never conducted or solicited any business in Delaware.

73. I have never contracted to provide goods or services in Delaware.

74. I do not have an interest in, use, or possess any real property in Delaware.

75. I do not have an office in Delaware.

76. Other than this lawsuit, I have never been a litigant in the Delaware court system, as a plaintiff or defendant.

77. I have never contracted to insure, or acted as a surety for, or on, any person, property, risk, contract, obligation or agreement located, executed, or to be performed within Delaware.

### No Texas Contacts

78. I do not reside in Texas, and I have never traveled to Texas in connection with my obligations under the Separation or Consulting Agreements.

79. I have never conducted or solicited any business in Texas.

80. I have never contracted to provide goods or services in Texas.

81. I do not have an interest in, use, or possess any real property in Texas.

82. I do not have an office in Texas.

83. Other than this lawsuit, I have never been a litigant in the Texas court system, as a plaintiff or defendant.

84. I have never contracted to insure, or acted as a surety for, or on, any person, property, risk, contract, obligation or agreement located, executed, or to be performed within Texas.

### Non-Party Witnesses

85. Amit Mulgaonkar is a former Mithril employee who has personal knowledge related to my claims and defenses, including Royan's fraudulent scheme.  He resides in San Francisco, California.

86. Jim O'Neill is a former Mithril employee who has personal knowledge related to my claims and defenses, including Royan's fraudulent scheme.  He resides in Marin County,

California, which is north of San Francisco and part of the Northern District of California.

87. Brian Behlendorf is a former Mithril employee who has personal knowledge related to my claims and defenses, including Royan's fraudulent scheme. He resides in Martinez, California, which is in the Northern District of California and works in San Francisco, California.

88. Peter Thiel is an investor in Mithril's funds who has personal knowledge related to my claims and defenses, including Royan's fraudulent scheme. He held a January 25, 2019 meeting with McKellar and several of his employees at his house in Los Angeles in which we discussed Royan's fraudulent scheme, as well as a January 26, 2019 meeting with Royan at his house in Los Angeles. While his primary residence is in Los Angeles, California, he also has a home in Northern California. In addition, he founded and is a partner in a venture capital fund that is located in San Francisco, California.

89. Tim Van Voris is an in-house counsel for Thiel who has personal knowledge related to my claims and defenses, including Royan's fraudulent scheme. He attended the January 25 and January 26, 2019 meetings at Thiel's house. Van Voris resides in Marin County, California, which is north of San Francisco and part of the Northern District of California.

90. Justin Truscott is the Chief Financial Officer for Thiel Capital who has personal knowledge related to my claims and defenses, including Royan's fraudulent scheme. He attended the January 25, 2019 meeting at Thiel's house. Truscott resides in San Francisco, California.

91. Bryce Steeg works for Thiel and has personal knowledge related to my claims and defenses, including Royan's fraudulent scheme. He attended the January 25, 2019 meeting at Thiel's house. Steeg resides in San Francisco, California.

92. Alex Kolicich is a former Mithril employee who has personal knowledge related to my claims and defenses, including Royan's fraudulent scheme. He resides in San Francisco, California.

93. Jelena Kovacs is a former Mithril employee who has personal knowledge related to my claims and defenses, including Royan's fraudulent scheme. She resides in San Francisco,

1. California.

94. Colin Greenspon is a former Mithril employee who has personal knowledge related to my claims and defenses, including Royan's fraudulent scheme. He resides in Marin County, California, which is north of San Francisco and part of the Northern District of California.

95. Andrew Garvin is the former Chief Financial Officer for Mithril who has personal knowledge related to my claims and defenses, including Royan's fraudulent scheme. He resides in San Francisco, California.

96. Jared Thear is an audit partner at Deloitte & Touche who has personal knowledge related to my claims and defenses, including Royan's fraudulent scheme. He is based in Deloitte & Touche's San Francisco office.

**Equitable Considerations**

97. The financial strain of this litigation—which currently spans three separate lawsuits across North America—is enormous and a great burden on me. Mithril and Feeder are represented by no fewer than nine attorneys from three law firms—including four partners from Kirkland & Ellis alone. Feeder recently filed a motion to remand the Delaware action, and then requested attorney fees from me—an individual—for the first time in its reply brief. When I requested advancement of my defense costs for the Texas and Delaware Actions—as required by the LLC Agreement that Feeder is suing under—Mithril and Feeder rejected that demand. Pursuing or defending three separate lawsuits against Mithril and Feeder—rather than just one in this Court—will detract from my new business, Anathem Ventures, which just launched in October 2019 (months after my termination) and is at a critical stage of development.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on January 17, 2020 in San Francisco, California.

*[signature]*

Crystal Scripps McKellar

-14-
DECLARATION OF CRYSTAL MCKELLAR